## BLACKBURN *v.* CRAWFORDS.

1. Though on a question of marriage and legitimacy, it is competent, in order to prove an heirship asserted, to give in evidence the declarations of any deceased member of *that* family to which the person from whom the estate descends belonged, yet it is not competent to give the declarations of a person belonging to another family,—such person being connected with the·person from whom the estate descends only by an asserted intermarriage of a member of each family.

2. Independently of statute requiring it to be kept, a baptismal register of a church, in which entries of baptism are made in the ordinary course of the clergyman's business, is admissible to prove the *fact* and *date* of baptism, but not to prove other facts, as, *ex. gr.*, that the child was baptized as the *lawful* child of the parents, and hence to infer a marriage between them.

3. By the law of Maryland a finding by a jury—on an issue directed by the Probate Court—that a party who has applied for administration on the estate of one whom he asserts to be his uncle, is illegitimate, and a consequent grant of administration by the court to another party, is conclusive of the illegitimacy *as between these parties,* in an action of ejectment subsequently brought by the party rejected.

4. Where there has been no official registry of marriages kept in the church where a clergyman ministered, a private memorandum, in which the ·minister, in the ordinary course of his business, has entered or intended to enter, as it occurred, each marriage celebrated by him, is admissible on a question whether such minister ever did or did not celebrate a particular marriage in question.

But the memorandum ought itself to be produced; and if the testimony of the minister proving the memorandum is taken by commission, the memorandum ought itself to be annexed to the deposition; or—if the deposition is taken in a foreign country and the possessor of the memorandum be unwilling to part with the original—a proved copy.

However, if neither the original nor such copy has been annexed, the objection to the want of such original or copy should be taken in some form (such as motion to suppress) before the trial. If made first on the trial it is too late. *York Co.* v. *Central Railroad,* 2 (*supra*, p. 107), on this point, affirmed.

5. On a question whether a particular priest of the Roman Church ever celebrated a marriage at a particular church between parties who had been previously living in fornication, his statement that no official registry of marriages was kept, but that he kept a private memorandum for himself (producing and annexing it as above specified), and that the alleged marriage did not appear in it; that he was aware the law imposed a penalty for performing the ceremony without a license;

that he never married parties without a license; that he always required the presence of two witnesses; and that he never celebrated a secret marriage between parties living in sin, one or both of whom would only be married on the condition that such marriage was to be kept secret—is admissible.

6. On a question of marriage and legitimacy, an attorney, who drew a will for the alleged husband now deceased, in which the children of the connection set up as wedlock are described as the "natural children" of the testator, may, without violating professional confidence, testify what was said by the testator about the character of the children and his relations to their mother, in interviews between the testator and himself preceding and connected with the preparation of the will.

7. If parties having had children in concubinage, marry and after the marriage recognize and treat such children as theirs, such children by the laws of Maryland are regarded as legitimate.

8. A marriage in the District of Columbia, if celebrated by a clergyman *in facie ecclesiæ* is not invalid for want of a marriage license.

9. Although parties have lived long together, and a marriage has been sworn to and the circumstances particularly described by one of the parties, and other witnesses have testified to facts indicative of wedlock as distinguished from a concubinate, still a jury may find, on counter evidence, that the cohabitation during the whole term was illicit.

10. In ejectment, where a regular marriage by a clergyman *in facie ecclesiæ* at a specific time and place is set up as evidence of the legitimacy of children suing as heirs-at-law to recover, and all the testimony in the case clusters about and relates to *such* a marriage, it is error to refer it to the jury to consider whether the parents were *at any time* married; and in such a case, unless they find that a marriage was in fact celebrated, they cannot find that the connection was wedlock or that the issue from it is legitimate.

11. It is error to instruct a jury that if a man and woman live together as husband and wife and the man acknowledge the woman as his wife and always treat her as such, and acknowledge and treat the children which she bore him as his children and permit them to be called by his name,—then that the *presumption of law* is in favor of their legitimacy. The question of legitimacy, under such circumstances, is a question for the jury; the law making no presumptions about it.

DR. CRAWFORD, of Prince George's County, Maryland, died *intestate*, in December, 1859, the proprietor of large landed estates there; Greenwood Park, Waring's Grove, Federal Hill, Westphalia, Ranleigh, &c. He left no wife, nor child, nor brother nor sister surviving him. Claimants to such estates, however, were not long wanting. On the one hand were relatives of the name of Blackburn, con-

fessedly his cousins-german; on the other, persons bearing his own respectable Scottish name of Crawford: George Thomas Crawford, Mary Elizabeth Crawford, Sarah Jane Crawford, and Anna Victoria Crawford, the children of a brother, Mr. Thomas B. Crawford, who had died before him. The title of these children—as nephews and nieces, and nearer of course than cousins—was clear, but for a single difficulty; the fact that their *legitimacy* was called in question. It was asserted that their mother had been the mistress not the wife of their father. The intercourse of the parties had, confessedly, in its origin been irregular; but the allegation was that a marriage had subsequently taken place.

The family name of the mother was Elizabeth Taylor. In May, 1860, Mr. Crawford being then dead, she gave under oath in a judicial proceeding her own account of her relations to him. She testified that thirty years before, she herself being then twenty-two years old, she became acquainted with Mr. Crawford; she also knew Dr. Crawford, and became acquainted with him before she knew his brother; she became acquainted with Mr. Crawford while she lived with her mother, on a place rented from Mrs. Magruder. Her intimacy commenced with Mr. Crawford at that place. She and her mother afterwards removed to Monterey (a seat some distance from the city of Washington), owned by Mr. Crawford; where her mother died; she herself and her brother, however, continuing to live there. Her eldest child was born there. The house at Monterey was furnished by Mr. Crawford, and he provided and paid all the servants. Her intercourse with him was not commenced and assented to by her under a promise of marriage. Soon after its commencement he often said he would like to marry her, but owing to his family he could not marry her then. When the child Sarah was about eight months old she went to Washington City to have it christened, and also to visit *her sister, Mrs. Evans,* who was the wife of the sexton of St. Patrick's Church, in that city; the child was christened in the church on Sunday, after eleven-o'clock service. As she

went out the *Rev. Mr. Fiziac*, who had performed the cere-
mony, and was one of the officiating priests there, followed
her and had a long conversation with her about the mode
of her life. He told her that the salvation of her soul was
of more importance to her than all things else, and that she
could not be saved if she continued living in sin with Mr.
Crawford. The conversation was a long one, and at his
instance she made up her mind, if Mr. Crawford would not
marry her, to leave him; Mr. Crawford had sent the car-
riage up for her to come home; she sent it back on that
Sunday evening, with a request that Mr. Crawford would
come up the next day. He accordingly came up, and she
had a long interview with him; she related to him what
Mr. Fiziac had told her, and that the salvation of her soul
was of more importance to her than all things else in this
world; that she must separate from him if he would not
marry her. He replied that he did not know about it, but
that he could not marry her unless the marriage was kept
secret from his mother and from his brother, Dr. Crawford.
She assented that the marriage should be kept secret, and
he then consented to marry her; she agreed that the mar-
riage should take place the next day. On the next day,
Tuesday, they went to St. Patrick's Church, and were there
married by the Rev. Mr. Fiziac; *her sister, Mrs. Evans*, and
her brother, Samuel Taylor, being present. Both of them
were now dead. Mr. Crawford returned home that evening.
She remained with her sister until the following Sunday,
and then returned home to Monterey in Mr. Crawford's
carriage. Mr. Crawford often, after the marriage, objected
to his brother, Dr. Crawford, knowing anything about it,
for, he said, if he did, that neither he nor his children would
ever get a cent of Dr. Crawford's property. Her children,
George and Victoria, were born after the marriage; George
was born some ten or twelve months after it. From the
time of the marriage she and Mr. Crawford lived together
as man and wife—about four years and a half before Mr.
Crawford's death. He took her and the children to live
with him at Greenwood, the place where the Crawford

family had been living; she took charge of the house at Greenwood, and sat at the head of the table; she made purchases for the family, and at the request of Mr. Crawford kept his money. She always kept the marriage secret, and never disclosed it until after the death of Dr. Crawford; she then disclosed it to Mr. Hill, who called upon her and asked her about it; he told her he had heard it rumored, and wanted to know the facts from her; she then, for the first time, told all about it to him. Mr. Crawford was always very kind to her; he sent the children to school, first to Wilson's, and afterwards sent the girls to Washington; the school bills were paid by him through her; he gave her the money to pay them; she also frequently purchased goods for the family in Washington and elsewhere; when she went to Washington she went in Mr. Crawford's carriage, and he occasionally went with her. When she first went to Greenwood, Dr. Crawford came there more frequently than afterwards; she always avoided him when he came, because she knew his dislike to her and the children. Dr. Crawford ceased visiting Greenwood for some time before the death of his brother, and was not there when he died. She was with Mr. Crawford at the time of his last attack; he was first attacked on the front porch at Greenwood; while in the act of stooping to wash he fell; she was close by, in the house, and was the first one to get to him; this was about six o'clock in the morning; he was carried into the house and placed upon a bed, and a physician immediately sent for. He rallied partially about one o'clock, and called for "Boss" (the nickname by which he called "our child," George); the child was handed to him, but he soon relapsed, and did not again revive that she saw before his death.

This was a narrative sufficiently touching, and quite circumstantial, no doubt. But was it true? Was the case one of a marriage solemnized in form, and kept a secret for five-and-twenty years; a romance, perhaps—discovered only in the end, by relatives not enriched, to be a reality. Or was it one where the relations between the parties were meretricious merely?

This was, in fact, the great question in controversy in the case; and the question to which the testimony was principally if not altogether directed.

There were facts that inferred a belief that it was the former. There were facts that induced a conclusion that it was the latter. Among those of the second class were the following:

As soon as it was discovered that Dr. Crawford had died intestate, the question arose, of course, " to whom shall administration of his estate be granted?" Mr. Blackburn claimed it on the one hand. Mr. George Thomas Crawford —the oldest of Mr. Crawford's children and his only son— upon the other. The Orphans' Court of Prince George's County, to which a decision of the question belonged, referred it to a jury to decide. The matter was put before them in the form of specific questions, one of them being, " whether, either before or after the birth of the said George Thomas Crawford, Mr. Crawford was ever lawfully married to Miss Elizabeth Taylor or not?" On the evidence, as then put before them, that jury found that he was not. Mr. Crawford's other children, the three daughters, were, however, no parties to this proceeding. The administration was finally granted to Blackburn.

So, too, a solemn act of Mr. Crawford himself, and his directions when performing it, tended to the conclusion of no marriage. In June, 1844, being desirous to make his will, he called on his friend and general professional adviser, Mr. Bowie, of Baltimore, to prepare a draft of it for him. On that occasion, as it appeared at a later day, and from Mr. Bowie's own narrative, he had a conversation with that gentleman as to the best mode of securing his property to his children; asking Mr. Bowie's advice in the matter. In the course of this conversation Mr. Crawford produced certain drafts of promissory notes, which he had signed, for the payment of large sums of money to his children, and stated that he had been advised to make the notes as provisions for them, by some one or other of his friends. He asked Mr. Bowie what *he* thought of it? Mr. Bowie, who

believed that Elizabeth Taylor was no more than the mistress of Mr. Crawford, and that his children were illegitimate, gave his advice to Mr. Crawford on that hypothesis. He objected to promissory notes, suggesting that they might lead to difficulties between the children and Mr. Crawford's relations, and explained to Mr. Crawford that there were three modes by which he might safely provide for the children, to wit: By a deed of his property, reserving a life estate to himself; *or* by his last will; *or* by marrying Elizabeth Taylor, and legitimating the children; Mr. Bowie strongly expressing his preference for the last-named expedient. Mr. Crawford, however, at once rejected the proposition that he should marry Elizabeth Taylor, and with great warmth declared that he would never do so. Upon this, Mr. Bowie advised him to make a will, and *so* to provide for the children. In accordance with this advice, Mr. Crawford directed Mr. Bowie to prepare the draft of a will, which he (Mr. Bowie) accordingly then did, agreeably to Mr. Crawford's instructions. Mr. Crawford especially instructed Mr. Bowie to describe the children, in this will, *as his natural children by Elizabeth Taylor;* and in consequence of this express direction the children were so described in the will, which was on record in the proper office in Prince George's County.

In time, matters came to the arbitrament of the Federal courts. Mr. Blackburn being in possession of various estates, of which his cousin, Dr. Crawford, had died seized, the children of Mr. Crawford, two of whom, it seemed, were born before the alleged marriage and two afterward, brought ejectment, in the Circuit Court for Maryland, to recover them. The fact of the marriage described by the mother of the children—by one side scrupulously styled Miss Elizabeth Taylor; by the other, as scrupulously, Mrs. Elizabeth Crawford—was, as this court declared, " the central and controlling question in the case." A great variety of evidence was taken. The lady who made so large a feature of the case was herself examined, and testified as it has been already stated. Evidence was given, that before some per-

sons Mr. Crawford called her his wife, and recognized the children as legitimate; as, also, that before others he called -her "Miss Betsy," and did not, affirmatively at least, recognize them as born in wedlock at all.

In the progress of the trial, numerous exceptions were taken by one side or the other. Some related to the admission and rejection of testimony; others to the instructions to the jury; the exception to these last being by the defendant only.

To prove the marriage, the counsel of the children, the plaintiffs in the case, offered in evidence the deposition of the Rev. J. P. Donelan, to prove that he had frequently heard *Sarah Evans**\** say that Mr. T. B. Crawford and Elizabeth Taylor were married. In order to lay a foundation for this testimony, it was proved *aliunde* that Sarah Evans was the sister of Elizabeth Taylor, and that she had been dead several years. The testimony was admitted, under objection by the other side.

They also offered in evidence the following entry in the baptismal register of St. Patrick's Church, in the city of Washington:

"1837, July 30. George Thomas, son of Thomas B. Crawford and Elizabeth Taylor, *his wife,* born 7th of September, 1836.

"*Sponsors,* John and Sarah Evans."

They proved that the ritual and usage of the church required such a register to be kept, and baptisms to be entered in it; and that this entry was in the handwriting of the Rev. Mr. Donelan, who, at its date, was the assistant pastor of the church. The defendant objected to the evidence as inadmissible for any purpose. But if it should be admitted, he contended that it was competent to prove no more than the *fact* and *date* of the baptism. The court overruled both objections, and admitted the entry as evidence, as well of the fact of the said baptism, and of the date thereof, as of the fact that the said George Thomas Crawford was baptized

---

\* The person already mentioned (*supra,* p. 178) as having been present at the marriage.

as the *lawful child*\* of Thomas B. Crawford and Elizabeth Taylor, his wife.

On the other side, the counsel of the defendant, Blackburn, then offered in evidence a transcript of the record in the Orphans' Court of Prince George's County, Maryland,. of the proceedings instituted in that court, touching the grant of administration upon the estate of Dr. Crawford, wherein the defendant, Mr. Blackburn, was petitioner, and George Thomas Crawford, one of the plaintiffs, was defendant, and wherein one of the issues ordered to be tried was, whether Mr. T. B. Crawford was ever lawfully married to Elizabeth Taylor, either before or after the birth of the said George Thomas Crawford. It was proposed by the counsel of Mr. Blackburn to read from the transcript the finding of the jury—which was in the negative—and also to read the order of the court made thereupon. The Circuit Court rejected the evidence.

The same counsel then offered the deposition of the Rev. Timoleon Fiziac, the priest by whom Elizabeth Taylor declared that she was married to Mr. Crawford. Father Fiziac was a native of France, who, after officiating for some years in America, had returned to his own country, and was now resident at the convent of the Sisters of St. Joseph de Cluny, at Limoux. His deposition was taken there under a commission, upon interrogatories. He testified that he was the officiating priest of St. Patrick's Church from 1831 to 1836; that no official register of marriages was kept, but that he kept a private memorandum for himself, and that the alleged marriage did not appear in it; that he was aware the law imposed a penalty for performing the ceremony without a license; that it was his habit to require its production, and that he always required the presence of two witnesses. He declined to annex the memorandum to his deposition. In his cross-examination he said he had no acquaintance with

---

\* The entry, in regard to one of the earlier children, described.*it* as the "*natural* child" of the parties.

the parties, and had no recollection of ever having seen them. The ninth and tenth cross-interrogatories, and the answers, were as follows:

"9th. State whether you would not have celebrated a secret marriage between parties living in sin, one or both of whom would only be married on the condition that such marriage was to be kept secret?

"*Answer.* I never did, indeed.

"10th. Are you aware that the penalty for marrying parties in Washington, without a license, was merely a pecuniary fine?

"*Answer.* I don't recollect whether I was aware of any penalty; *but I never married parties without a license.*"

The court excluded all that part of the deposition which related to the memorandum, the answer to the ninth cross-interrogatory, and that portion of the answer to the tenth, which is in italics.

The defendant gave in evidence the will of Mr. Crawford, and proved by Mr. Bowie that it was drawn in conformity to the instructions of the testator. It spoke, as we have already said, of the defendants in error as his natural children by Elizabeth Taylor, and provided for them accordingly. It spoke of her as probably *enceinte* at that time, and provided for the unborn child. The defendant then offered to prove, by Mr. Bowie, what was said by the testator in their interviews preceding the preparation of the will concerning the illegitimacy of the children and his relation to their mother. The court excluded the evidence.

All the evidence being gone through, the plaintiff asked the court to give certain instructions, of which the first and third were thus:

"1st. That if the jury find, from the evidence of Elizabeth Crawford, that she was married at St. Patrick's Church, in the city of Washington, by the Reverend Timoleon Fiziac, then the assistant minister of said church, on the first of September, 1835, to Mr. T. B. Crawford; and shall further find, from the evidence, that two of the lessors of the plaintiff were children of the said

T. B. Crawford and the witness, born prior to the marriage, and subsequently to the marriage were recognized and treated by said T. B. Crawford as his children; that the other two lessors of the plaintiff were children of T. B. Crawford and Elizabeth Crawford, were born subsequently to said marriage,—then the verdict must be for the plaintiff.

"3d. That a marriage celebrated as deposed to by the said Elizabeth Crawford, if the jury shall find that it was so celebrated, would not be invalidated because no marriage license had been obtained."

These instructions the court gave; no opposition being made to their being given by the other side.

The defendant asked the court to charge thus:

"1. That it will be competent for the jury, on all the evidence, to find that the cohabitation between Mr. Crawford and Elizabeth Taylor, during the entire period of such cohabitation, was illicit, and that no marriage was ever solemnized between them; and if they so find, their verdict ought to be for the defendant.

"2. That it is competent for them, on all the evidence, to find that no marriage was ever celebrated between the said Crawford and Elizabeth Taylor; and unless they find that a marriage was in fact celebrated between them, their verdict ought to be for the defendant."

These instructions the court refused to give; and independently of requests from either side, charged in substance thus:

"1. If the jury find that T. B. Crawford and Elizabeth Taylor were married *at any time*, and that two of the lessors of the plaintiff were born subsequent to the said marriage, and two of them were born before it, and that those two so born before marriage were, subsequently to its date, acknowledged and recognized by Mr. Crawford as his children, then their verdict must be for the plaintiff.

"2. The jury may find the marriage from the testimony of Mrs. Crawford, if they believe her, or from the acts and declarations of Mr. Crawford, taken in connection with all the other evidence in this case; and such marriage, to be valid in this State, requires only the consent of the parties, and would be

valid, although the jury may find that it was not solemnized before any minister of the gospel.

"3. And if the jury shall find that *at any time* Mr. Crawford and Elizabeth Taylor lived together as man and wife; that he acknowledged that she was his wife, and always treated her as such; and the children which she bore during that time as his children, and permitted them to be called by his name, then the presumption of law is in favor of the legitimacy of said children. But if the jury shall find, from all the evidences in the case, that no marriage ever took place between the parties, then that their verdict should be for the defendant."

The jury found for the plaintiffs; thus finding a marriage. After judgment, the case came on error here; where it was thoroughly argued by *Messrs. Reverdy Johnson and Alexander, for Blackburn, the nephew, plaintiff in error; and by Messrs. Brent and Merrick, for the children, contra.*

The questions considered by this court, on exceptions to the evidence and instructions, in the order which precedes, were these:

1. As to the evidence (the Rev. Mr. Donelan's deposition), that Mrs. Sarah Evans, sister of Elizabeth Taylor, had frequently said that Mr. Crawford and her sister were married; the counsel for the plaintiff in error contending that the declarations of Mrs. Evans, who was in no way related by blood to the family of Crawford, were inadmissible to prove a marriage; and opposite counsel citing and relying on *Moncton v. The Attorney-General,* a decision of Lord Brougham, as establishing a wider doctrine, and to show that they were.

2. As to the entry on the baptismal register of St. Patrick's Church—was it admissible at all; there being no statute in Maryland requiring such registers to be kept? If it was admissible, how far was it evidence? Did it tend to prove legitimacy? or only the fact and date of the administration of the baptism?

3. The testimony of the Rev. Mr. Fiziac, and the action of the court below upon it.

---

* 2 Russel & Milne, 156.

4. The proceedings in the Orphans' Court of Prince George's County. What was their effect? a matter upon which statutes of Maryland were cited.

5. The matter of Mr. Bowie's testimony. How far did the law of privileged communication apply to the case?

6. The instructions requested, and those given to the jury. How far were they right? and how far the reverse of it?

Mr. Justice SWAYNE delivered the opinion of the court.

We will consider the exceptions, so far as we deem necessary—both as respects the testimony and the instructions—in the order in which they are presented by the record; [the order which precedes. REP.]

The *first* exception relates to the admission of evidence as to what Sarah Evans had said in regard to the marriage of her sister, Elizabeth Taylor, with Mr. Crawford.* Was the testimony rightly admitted?

Greenleaf says:† "It is now settled that the law resorts to hearsay evidence in cases of pedigree, upon the ground of the interest of the declarants in the person *from whom the descent is made out,* and their consequent interest in knowing the connections of the family. The rule of admission is therefore restricted to the declarations of deceased persons who were related by blood or marriage to the person, and therefore interested in the succession in question."

It is well settled, that before the declarations can be admitted, the relationship of the declarant to the family must be established by other testimony.‡

Here the question related to the family of Dr. Crawford. The defendants in error claimed to belong to the family, and to be his nephew and nieces. To prove this relationship, it was competent for them to give in evidence the declarations of any deceased member of that family. But the declarations of a person belonging to another family—such person claiming to be connected with that family only by

* *Supra*, p. 182.     † On Evidence, vol. i, § 103.
‡ 1 Taylor on Evidence, § 576.

the intermarriage of a member of each family—rests upon a different principle. A declaration from such a source of the marriage which constitutes the affinity of the declarant, is not such evidence *aliunde* as the law requires.

It is insisted by the defendants in error, upon the authority of *Moncton* v. *The Attorney-General*,\* that it was sufficient to show the relationship of the declarant to Elizabeth Taylor. As we understand that case, it has no application to the point under consideration. None of the writers on the law of evidence have given it so wide a scope. Hubback thus† states the principle which it decides: "It is sufficient that the declarant be connected by extrinsic evidence with one branch of the family, touching which his declaration is tendered." Lord Brougham himself said in that case: "I entirely agree that, in order to admit hearsay evidence in pedigree, you must, by evidence dehors the declarations, connect the persons making them, with the family. To say that you cannot prove the declarations of A., who is proved to be *a relation by blood of B.*, touching the relationship of B. with C., unless you have first connected him with C., is a proposition which has no warrant, either in the principle upon which hearsay is let in, or in the decided cases." If it had been proved by independent testimony that Sarah Evans was related by blood to any branch of the family of David Crawford, and her declarations had been offered to prove the relationship of another person claiming, or claimed to belong also to that family, this case would be in point. But the declaration of Sarah Evans, offered to prove that her sister was connected by marriage with a member of that family, was neither within the principle nor the language of that authority.

In *Edwards* v. *Harvey*‡ an issue out of chancery was directed, to try the question whether "A. B., from whom the plaintiff claimed, was not proved to be related to C. D., who was the granting party in the conveyance to the plaintiff." A new trial was moved for, on the ground that the court had rejected a paper offered in evidence by the plaintiff.

---

\* 2 Russel & Milne, 156.        † On Succession, 660.        ‡ Cooper, 38.

"It was a pedigree drawn out by Bridget Lloyd, a maiden lady, deceased, showing that C. D., who was her relative, was related to A. B." The master of the rolls "refused a new trial, because if Miss Bridget Lloyd's pedigree, written by herself, were evidence for her relation, so would her declaration have been, to show that she was herself entitled to the estate."

In *Doe* v. *Fuller*\* Chief Justice Best said: "If there were no other evidence than the declarations of *John* to show that James was a member of the family, they could not have been received, as that would be carrying the rule as to the admissibility of hearsay evidence further than has ever yet been done, viz., *to allow a party to claim an alliance with a family by the bare assertion of it.*"

We think the court erred in admitting the testimony.

The next question is as to the entry in the baptismal register of St. Patrick's Church.† The plaintiff in error objected to it as inadmissible for any purpose. If admitted, he contended that it was competent to prove but the fact and date of the baptism. The court overruled both objections, and admitted the entry as evidence, as well of the fact and date of the baptism, as of the fact that the child was baptized "as the lawful child of Thomas B. Crawford and Elizabeth Taylor, his wife."

The register was admissible upon the ground that the entries in it were made by the writer in the ordinary course of his business.

*How far* such an entry is evidence, is a different question. Upon that subject, Starkie‡ thus lays down the rule: "An entry of the time of a child's birth, although contained in a public register, is not evidence as to *the time of the birth*, unless it can be proved that the entry was made by direction of the father or mother; and this seems to be received as a declaration made by one of them—for a clergyman has no authority to make an entry as to the time of the birth, *and*

---

\* 2 Moore & Payne, 24.    † *Supra,* p. 182.
‡ On Evidence, 612; 2d Lond. ed.

*possesses no means for making* any inquiries as to the fact."
Greenleaf* says : " It is to be remembered that they are not
generally evidence of any fact not required to be recorded
in them, and which did not occur in the presence of the re-
gistering officer. Thus a parish register is evidence only of
the time of the marriage, and of its celebration *de facto*, for
these are the only facts necessarily within the knowledge of
the party making the entry."

Without further evidence, the court ought not to have
admitted the entry in question for any purpose but to prove
the baptism of the child, and the date of the administration
of the rite. We think this proposition too clear to require
discussion.

The third matter is as to the transcript of the record in
the Orphans' Court of Prince George's County, Maryland.
It was proposed by the plaintiff in error to read from it the
finding of the jury which, upon one issue directed,—that
namely whether Mr. Crawford ever lawfully married Eliza-
beth Taylor, either before or after the birth of George
Thomas Crawford—was in the negative : and also to read
the order of the court made thereupon.† The court below
rejected the evidence.

Such a result, under the laws of Maryland, to which our
attention has been called, has all the elements of *res judi-
cata*. The transcript was competent evidence against George
Thomas Crawford. As to him it was an estoppel, and barred
his right of action. But it did not affect the other defen-
dants in error, who were not parties to the proceeding. If
they proved a marriage, as alleged, they were entitled to
recover the entire property. This they might have done,
although the demise was laid in the declaration as made
jointly by all the parties. By a statute of Maryland, a joint
demise is made several as well as joint, and a recovery may
be had accordingly, by one or more of the lessors. In this
case it was immaterial to the plaintiff in error, who reco-
vered. A verdict in favor of one or all was alike fatal to

---

* On Evidence, § 493.                    † *Supra*, p. 183.

his claim to the property in controversy.  The error of the court, therefore, did him no injury.

We come, in the fourth place, to consider the matter of the testimony of the Reverend Mr. Fiziac, examined in France on a commission, and whose deposition was offered by the plaintiff in error, and in a large part excluded by the court.*

The witness is not very explicit as to the " private memorandum" which he testifies that he kept.  We understand, from what is said, that it was a book or paper, in which he entered, or intended to enter, each marriage as it occurred. Such entries, being made by the writer in the ordinary course of his business, are competent evidence.

If offered to prove a marriage, the production of the memorandum would have been necessary, for two reasons: it would have been the best evidence of the existence and contents of the entry, and would have given to the adverse party the means, to which he was entitled, of a cross-examination.  Here it was proposed to use the testimony negatively.  The object was to draw the inference that the marriage had not occurred, from the fact that no entry of it was found to exist.  We think the same considerations apply as if the purpose had been to prove a marriage affirmatively.

While the memorandum was within the reach of the party, proof that it did or did not contain a particular entry could not be received without producing the memorandum itself. In the absence of proof of a further effort to procure the original—or, failing that, of an effort to procure an examined copy—this objection, taken at the proper time, would perhaps have been sufficient to exclude the testimony.  If it had been notified in season to the plaintiff in error that the objection was to be made, he might have obviated the difficulty.  The deposition was taken in France, under a commission, upon interrogatories by both parties.  The objection could not, therefore, be made before the taking officer.  It should have been presented, before the trial, by a motion to suppress.  At the trial it came too late.  It was

---

* *Supra*, p. 183.

then to be considered as finally waived.* The court, therefore, erred in rejecting the testimony.

In regard to the other exception relating to this deposition, we entertain no doubt. The cross-interrogatories were not very respectful to the witness. His answers were natural and proper, and should have gone to the jury.

The fifth point raised relates to Mr. Bowie.† Was the testimony of this gentleman—the attorney who drew the will of Mr. Crawford, and by whom the plaintiff in error offered to prove what was said by the testator in their interviews preceding the preparation of the will, and, in that connection, concerning the illegitimacy of the children and his relation to their mother—rightly excluded?

It is asserted that the communications upon these subjects to the attorney were covered by the seal of professional confidence, and that he could not, therefore, be permitted to disclose them.

The principle of privileged communications was ably considered by Lord Brougham in *Greenough* v. *Gaskel.*‡ He said: "The foundation of the rule is not difficult to discover. It is not (as has sometimes been said) on account of any particular importance which the law attributes to the business of legal professors, or any particular disposition to afford them protection, though certainly it may not be very easy to discover why a like privilege has been refused to others, and especially to medical advisers. But it is out of regard to the interests of justice, which cannot be upholden, and to the administration of justice, which cannot go on, without the aid of men skilled in jurisprudence—in the practice of courts—and in those matters affecting the rights and obligations which form the subject of all judicial proceedings. If the privilege did not exist at all, every one would be thrown upon his own legal resources. Deprived of all professional assistance, a man would not venture to

---

* York Co. *v.* Central Railroad, *supra*, p. 107.

† *Supra*, p. 184.                    ‡ 1 Mylne & Keen, 98.

consult any skilful person, or would only dare to tell his
counsel half his case."

In *Russel* v. *Jackson*,* the contest was between the heirs-
at-law and a devisee. The heirs claimed that the devise
was upon a trust, unexpressed, because illegal. The ques-
tion was, whether the solicitor by whom the will was drawn
should be allowed to testify what was said by the testator
contemporaneously upon the subject? The devisee claimed
the benefit of the rule. The Vice-Chancellor said: "When
we pass from cases of conflict between the rights of a client
and parties claiming under him—and those of third per-
sons—to cases of a testamentary disposition of a client, do
the same reasons apply? The disclosure in such cases can
affect no right or interest of the client; and the apprehension
of it can present no impediment to a full statement to the
solicitor, unless he were contemplating an illegal dispo-
sition—a case to which I shall presently refer; and the dis-
closure, when made, would expose the court to no greater
difficulty than it has in all cases when the views and inten-
tions of parties, or the objects for which the disposition is
made, are unknown. In the case, then, of a testamentary
disposition, the very foundations on which the rule proceeds
seem to be wanting; and, in the absence of any illegal pur-
pose entertained by the testator, there does not seem to be
any ground for applying the rule in such a case. Can it be
said, then, that the communication is protected because it
may lead to the disclosure of an illegal purpose? I think
not; and that evidence, otherwise admissible, cannot be re-
jected upon such grounds. Another view of the case is, that
the protection which the rule gives, is the protection of the
client; and it cannot be said to be for the protection of the
client that evidence should be rejected—the effect of which
would be to prove a trust created by him, and to destroy a
claim to take beneficially by the parties accepting the trust."

This reasoning applies to the declarations of the testator
here in question. How can it be said to be for his interest

---

* 15 Jurist, 1, 117.

to exclude any testimony in support of what he solemnly proclaimed and put on record by his will? Especially can this be said in regard to property to which he never had or assumed to have any title, and in regard to a claim by others to that property, which he did all in his power, by his will, to foreclose?

But there is another ground upon which we prefer to place our decision. The client may waive the protection of the rule. The waiver may be express or implied. We think it as effectual here by implication as the most explicit language could have made it. It could have been no clearer if the client had expressly enjoined it upon the attorney to give this testimony whenever the truth of his testamentary declaration should be challenged by any of those to whom it related. A different result would involve a perversion of the rule, inconsistent with its object, and in direct conflict with the reasons upon which it is founded.

Finally, as to the instructions to the jury asked and refused, and as to those given.*

The first and third instructions offered by the defendants in error were properly given. The two instructions submitted by the plaintiffs in error were unexceptionable, and should also have been given. The three instructions given by the court *suâ sponte* were characterized by a common error. They submitted to the jury, as a question to be considered, whether there was not a marriage at a different time and place, and contracted in a different manner from that alleged by the putative wife, Elizabeth Taylor. Her testimony was clear and positive. It was wholly inconsistent with such a proposition. If there were none as alleged by her, clearly there was none at any time. This was the hinge upon which turned the controversy. All the testimony clustered about and related to that inquiry. The jury should have been so instructed, and their deliberations confined accordingly. Lord Hale says, they should be told " where the main question or the knot of the business lies."† The

---

* *Supra,* pp. 184–6.          † History of the Common Law, 256

further inquiry did not arise in the case.   What was said could hardly fail to mislead and confuse.   It permitted them to substitute conjecture for deduction, and opened a field beyond the sphere of the case, where the means of error were abundant.

The third of these charges is liable to a further objection. It instructed the jury, that if the facts were as there stated, "the presumption of law was in favor of the legitimacy of the children."   Under such circumstances the law makes no presumption.   The question to be determined was one of fact and not of law.   The facts referred to were a part of the evidence.   They were to be weighed against the countervailing evidence.   They might, by possibility, all be true, and yet no marriage have occurred, and the children all be illegitimate.

In our view of the case, the question of a marriage *per verba de presenti* did not arise.   We have, therefore, not considered that subject.

JUDGMENT REVERSED, with costs, and the case remanded to the Circuit Court, with an order to issue a *venire de novo.*

Mr. Justice CLIFFORD dissenting.

I dissent from the judgment of the court in this case, and that is all I think it necessary to say in reply to several of the prominent topics discussed in the opinion of a majority of the court.   But there are three propositions laid down in the opinion to which I desire specially to refer as not receiving my assent, because I think they are of some practical importance.

1. The Circuit Court admitted the church record, or evidence of its contents, after proof of its loss.   The effect of the decision here is that it was not admissible.   Unless I am greatly deceived, the ruling of the Circuit Court is sustained by all the authorities upon the subject.   Apart from authorities it seems to me that it was correct in principle, as evidenced by the general course of practice.

2. Second proposition referred to has respect to the testi-

mony of the attorney. I think it was properly excluded as falling within the rule of privileged communication; and I am also of the opinion that the suggestion of waiver is utterly without foundation or just pretence.

3. Reference is made in the third place to the construction given to the charge of the Circuit Court. Rightly interpreted, the charge, as it seems to me, is correct; but the opinion of the majority of the court places a construction upon it which I think does great injustice to the judge who presided at the trial.

Having stated the three propositions to which I dissent, I do not wish to add anything to the statement.