D C.]                          Syllabus.

# JENNINGS *v.* WEBB.

DEEDS, CONSTRUCTION OF; EVIDENCE; RECITALS IN WILL AS PROOF
   OF RELATIONSHIP; STATUTORY CONSTRUCTION; SLAVE
     MARRIAGES, LEGITIMACY OF ISSUE OF;
        MARRIAGE, PROOF OF.

*1.* Where a deed naming the grantors as of the "one part" and the
   grantees "of the other part," conveys the premises to the "said
   party of the second part, his heirs and assigns forever," to have
   and to hold, etc., "unto him the said party of the second part,
   his heirs and assigns," etc., the apparent clerical error in the
   words of conveyance to the *party* of the second part instead of
   *parties* will not be held to change the plain intent of the deed,
   which is to convey the title to the grantees jointly.

*2.* In a suit in which is involved the question of heirship of one of the
   parties, a will which is not effective as a muniment of title, may
   with its recitals of relationship, be evidence of such relationship.

*3.* Legislation having for its object the validating of slave marriages
   and the legitimating of the issue of such marriages will receive
   the broadest and most liberal interpretation not incompatible
   with its express provisions, so as to include within the scope of
   its relief all persons that can be comprehended in its spirit.

*4.* Sec. 726, R. S. D. C., legitimating the children of slave parents who
   had ceased to cohabit before July 25, 1866, in consequence of
   the death of the mother, and the act of Congress of February 6,
   1879 (20 Stat. 282), apply as well to slave parents who lived
   together as husband and wife outside of this District as to those
   who lived here.

*5.* The fact of marriage may be proved by the declarations of deceased
   persons related by blood or marriage to the person whose mar-
   riage is sought to be proved, but the proper relationship of dec-
   larant must first be established.

*6.* The fact of marriage may be inferred from circumstances, and in
   questions of legitimacy, where not inconsistent with other facts
   in evidence, it may be established by proof of cohabitation and
   repute; and greater liberality of inference will be indulged in in
   cases of slave marriages than in cases of marriages of free white
   persons.

   No. 470.   Submitted January 9, 1896.   Decided February 4, 1896.

HEARING on an appeal by the plaintiff from a judgment
on a verdict directed by the court in an action of ejectment.
*Reversed.*

The COURT in its opinion stated the case as follows:

This is an action of ejectment brought by appellant, Franklin Jennings, as plaintiff below, against the appellee, Elizabeth Webb, as defendant, to recover an undivided one-half interest in a certain lot in square 107 in the city of Washington.

(1) After proving title from the United States in John S. James and C. A. James to the lot in controversy, plaintiff offered a deed from them to Paul Jennings and Frances Jennings, his daughter, dated May 5, 1857. This deed, naming the grantors as of the " one part," and the grantees as " of the other part," and reciting a consideration of $1,000 as paid, conveyed the premises to the " said party of the second part, his heirs and assigns forever," to have and to hold, etc., " unto him the said party of the second part, his heirs and assigns," etc. This deed was properly acknowledged and recorded.

(2) The bill of exception recites the parol evidence given by plaintiff as follows:

" Further evidence was given by the plaintiff on his own behalf tending to show that he is 59 years old, and is the son of Paul Jennings, who, in 1854, purchased and entered into possession of the east part or third of said lot, adjoining on the east the part described in the declaration, and took his children, consisting of this plaintiff, his said sister, Frances, and his brothers, John and William Jennings, to reside with him in the frame house situated thereon, numbered 1804 L street; that there was a house of the same character situated on the part of said lot described in the declaration, numbered 1806 L street; that said Paul Jennings continued to occupy said house, No. 1804 L street, with his said children and his second wife, until said conveyance of No. 1806 to him and his said daughter, Frances, when he caused the tenant occupying No. 1806 to remove therefrom; and further evidence was given, consisting of the testimony of the plaintiff and other witnesses, tending to

show that said Paul had a door cut and kept always open
in the area partition between said houses, for easy access
between the two, and said Paul, for about three years after
the death of his wife, used to sleep in one house (No. 1804)
and take his meals in the other (1806); that the defendant
was the daughter of said Paul's first wife by a former hus-
band, and came to Washington from Virginia in 1857; that
said Frances was not of sound mind and was incapable of
taking care of herself or attending to business, but could
and did work and earn some money at washing and ironing;
that said Paul placed said Frances in No. 1806 and also
placed the defendant therein, and stated in the presence of
the plaintiff and the defendant that he placed her therein to
take care of said Frances as long as she (Frances) should
live, they to pay the taxes thereon from the renting of rooms
and their other earnings, and that at said Frances' death the
same was to go to his sons, John and Franklin; to which
the defendant made no reply; and that the plaintiff gave
the said Frances and the defendant some money to help pay
the taxes, at one time giving them $100; that said Paul
removed and lived away from No. 1804 for some time, but
returned thereto and died therein in 1874, aged about 85
years, leaving the plaintiff, Frances, and John, as his only
children. John died, leaving children; William had died
before their father; that said Frances and the defendant con-
tinued to occupy No. 1806 until six or seven years ago,
when Frances was put out by the defendant, and she died
in the poor-house a year or two afterwards, intestate and
never having been married; that the defendant has since
remained in possession and refused to give it up; that be-
fore the other suit, four or five years ago, she told him the
house was hers; said she had a tax-title deed.

" The plaintiff testified in his own behalf that said Paul,
his father, was a slave in Virginia, owned by President
Madison, and was his body servant before and while he
was President, and became free before he purchased the
property in question; that the mother of the plaintiff and

of his said sister, Frances, and brothers John and William, was also a slave in Virginia, belonging to Charles P. Howard, near Orange Court House ; that the father and mother of the plaintiff and of his sister Frances and brothers John and William were married according to the custom of Virginia slaves, and lived as husband and wife with their children in a house by themselves, always recognized and treated the plaintiff and his brothers and sister as their children as long as their mother lived, and the father did so as long as he lived, and the children recognized and treated them as their father and mother and each other as brothers and sister ; that up to the time of the death of the mother the father, while living with his master in Washington, used to go and stay with her in Virginia for a month or two at a time, and sometimes longer, occupying the same house with her and their children exclusively, and he was with her when she died and for some three weeks prior to her death. On cross-examination he stated that their mother died when plaintiff was about seven years old ; that he did not know of his own knowledge about the marriage of his parents, but that his uncles in Ohio knew about it ; and testified that in 1855 or 1856 the children became free and their father brought them to Washington, and they all lived with him on the premises No. 1804 L street ; that some four years before the war the plaintiff went to live with one of his two uncles living in Ohio, and lived in Ohio in all about sixteen years, and settled in Dumfries, Virginia, in 1880.

" Testimony was also given by other witnesses that said Paul and said children lived together on the premises No. 1804 L street, and that he recognized and treated them as his children and always so called them, and they treated, called, and recognized him as their father and each other as brothers and sister, both among themselves and to and among others.

"(3) And the plaintiff offered and read in evidence the will of said Paul Jennings, duly probated in this District on the 29th day of September, 1874, as follows :

" I, Paul Jennings, of the city of Washington, D. C., being of disposing mind and memory, declare this to be my last will and testament.

" I will and bequeath to my two sons, John and Franklin Jennings, my house and lot, situated on the south side of L street, between 18th and 19th Sts., and known as number 1804 in the city of Washington, D. C., subject to the following conditions, viz.: That the house and lot shall be jointly occupied by my said sons, John and Franklin, or in the event of their death, by their respective heirs, for the period of five years, commencing from the date of my death and at the expiration of the said five years, to be sold by my executor, hereinafter named, and the proceeds thereof, after deducting all lawful expenses, shall be equally divided between them, or, in the event of their death, between their heirs at law. And it is further conditioned that before the bequest thus made shall pass to my two sons, as aforesaid, they shall jointly pay to my daughter, Frances Jennings, the sum of five dollars, lawful money of the United States, each and every month, for the period of five years, commencing from the date of my death ; and that my future wife, Amelia Dorsey, shall have the right and privilege if she so desires, of occupying a part of my said house for the period of five years, free from all rent or demands ; such occupancy consisting of one good room, which she may elect in said house. And it is further directed, that if either or both of my sons should decline to occupy the house during the five years aforesaid, then the said premises to be rented less the room occupied by my future wife, and the proceeds thereof to be equally divided between them, or if either of my said sons should occupy the said house, then he to pay the other a monthly sum equal to his proportion of a fair rental for the same.

" I further will and bequeath to my said sons John and Franklin Jennings, all my personal effects, and whatever interests I may have, real, personal or mixed.

" I furthermore appoint Samuel V. Niles, of Washington City, D. C., the executor of this my will.

" In testimony whereof I, Paul Jennings, have to this my last will and testament, subscribed my name, and affixed my seal, this thirteenth day of September, A. D. 1870.

"PAUL JENNINGS. [L. S.]"

The foregoing will was properly executed and attested.

(4) The plaintiff having closed, the defendant moved the court to instruct the jury to return a verdict for her upon the ground " that the evidence was not sufficient to warrant the jury to find that the plaintiff and said Frances were the legitimate children of Paul Jennings, or that the plaintiff was one of the heirs at law of said Frances or said Paul or entitled to inherit from her or him." The motion was granted, a verdict was returned for defendant, and from judgment thereon plaintiff has appealed to this court.

*Mr. Charles H. Cragin* and *Mr. Samuel R. Bond* for the appellant :

1. If these parties had been white, or free-born colored people, there could be no possible question. The relations between father and child, the recognition of each other as such, and the living together as husband and wife, being proved, the law would certainly permit legitimacy to be inferred. *Frank* v. *Hirsh*, 3 App. D. C. 491 ; Lawson on Presumptive Evidence, p. 107 B; *Strode* v. *Magorvan*, 2 Bush, 627 ; *Gaines* v. *Hennen*, 24 How. 553 ; *Gaines* v. *New Orleans*, 6 Wall. 690 ; *United States* v. *Route*, 33 Fed. Rep. 246. In the last case the court says this rule is especially applicable among slaves and is recognized by Congress in sec. 4705 Rev. Stat., which relates to pensions to colored soldiers and their widows. See also *Green* v. *Norment*, 16 D. C. 88.

2. Congress has legislated with respect to the rights of colored persons, formerly slaves ; the first legislation being in behalf of those who came to reside in this District. Act of July 25, 1866 (14 Stat. 236), incorporated into R. S. D. C. as Secs. 724, 725 and 726. Plaintiff's case is clearly

comprehended in the provisions of the latter section. Subsequently, to meet the cases of those who had never resided in this District, the act of February 6, 1879, was passed ; and the proof of marriage or custom in this case was sufficient to comply with the requirements of that act. See *Thomas* v. *Holtzman*, 18 D. C. 62.

That the agreement of the parties to assume the relation of husband and wife, and the consent of their masters, may be presumed from the acts of the parties has been held in numerous cases. *Andrews* v. *Page*, 3 Heisk. 653 ; *Jones* v. *Jones*, 36 Md. 447 ; *Diggs* v. *Wormley*, 21 D. C. 477 ; *Francis* v. *Francis*, 31 Grat. 283 ; *Scott* v. *Raub*, 88 Va. 721.

Among similar statutes passed by most, if not all, of the former slave States was that of Virginia of 1866 (Code of 1887, sec. 2227). If this act is applicable to this case, there can be no question that under it the proof was ample.

We recognize that the descent of real estate is governed by the *lex rei sitœ*, but it is equally true that the law of the place where the parties were domiciled at the time of the marriage governs as to its validity and the legitimacy of the offspring. The latter rule is not an invasion of or in conflict with the other, but proceeds from the *jus gentium*, which is part of the law of every country. Story on Conflict of Laws, secs. 79, 80, 80ᵃ, 105, 121, &c.; 2 Kent's Com. p. 91 (marginal); Washburn on Real Property (5th ed.), p. 222, sec 4.

Legitimation by legislative enactments has been very generally resorted to as a needed and legal remedy for the condition in which former slaves were left after the war. They have been upheld and commended by the courts of the States in which they were passed, and have retroactive effect where vested rights have not accrued. 1 Bishop on Mar. and Div., secs. 162, &c.; Cooley's Const. Limitations (6th ed.), 458–9 ; *Andrews* v. *Page*, 3 Heisk. 653 ; *Rice* v. *Rice*, 31 Tex. 174 ; *Honey* v. *Clark*, 37 Id. 686 ; *McKnight*

v. *State*, 6 Tex. Ct. of Appeals, 158 ; *State* v. *Adams*, 65 N. C. 537 ; *Scott* v. *Raub*, 88 Va. 721.

Such legislation relates to the *status* of the parties and has extra-territorial effect, provided it is not *contra bonos mores*, and does not prejudice the powers or rights of other governments or their citizens.   Wharton's Conflict of Laws, secs. 173, 249, citing Reconstruction Acts, and 250 ; *Honey* v. *Clark*, 37 Tex. 686, and *McConico* v. *State*, 49 Ala. 6.

Marriages between slaves, or the relation in which they lived together as husband and wife, recognizing the off-spring as their children, &c., were never unlawful; such intercourse was never regarded as illicit, nor were the children regarded as bastards or of corrupt blood.   Bouvier's Law Dict., title " Contubernium ;" 1 Bishop on Mar. and Div. 163[h] ; *Jones* v. *Jones*, 36 Md. 447 ; *Rice* v. *Rice*, 31 Tex. 174.

This Virginia act dispenses with the necessity of the *rites* of matrimony, but not with the consensual relation of husband and wife.   This constituted a valid marriage at common law (*Meister* v. *Bissell*, 6 Otto, 76), which will be presumed to prevail in other jurisdictions till the contrary is shown.

*Mr. D. O' C. Callaghan* and *Mr. W. F. Mattingly* for the appellee :

So far as this record discloses, this is the ordinary and common case of slaves living together and having children, who are, of course, without inheritable blood.   The parents were incapable of contracting, not excepting the contract of marriage.   *Hale* v. *United States* and *United States* v. *Roach*, 92 U. S. 27 ; *Hall* v. *Mullin*, 5 H. & J. 190 ; *Bland* v. *Dowling*, 9 G. & J. 27.

Paul Jennings died in 1874, five years prior to the passage of this act, the defendant being in possession under claim of title.   Her title could not be divested by such sub-

sequent legislation, nor can this act operate retrospectively. *Donovan* v. *Pitcher*, 25 Am. Rep. 634.

The act of Virginia of 1866 was passed twenty-three years after the death of the mother and ten years after all the parties had left the State.    It is somewhat difficult to see how it could have any such extra-territorial effect, and it is apparent that it could not have.    Story's Con. Laws, sec. 278; *Scott* v. *Sanford*, 19 How. 393, 405.

Mr. Justice SHEPARD delivered the opinion of the Court :

1. Some question has been made as to whether the deed from James and wife " of the one part " to Paul and Frances Jennings " of the other part," passed the title to Paul Jennings only, or to said Paul and Frances Jennings as joint tenants.    Under either construction the interest of the plaintiff is the same, and the question, therefore, is of no material importance.    It is proper to say, however, that the apparent clerical error in the words of conveyance to " the party of the second part, his heirs and assigns," cannot have the effect to change the plain intent of the deed.    The necessary effect of the deed was to convey the title to Paul and Frances Jennings, as joint tenants.

2. As Frances Jennings survived her father, the will of Paul Jennings can have no effect upon the plaintiff's right, as a muniment of title, and it is unnecessary to consider the effect of its residuary clause.    It remains, however, with its recital of relationship, as father and son and daughter, between Paul Jennings and the plaintiff and Frances Jennings, for whatever weight may be given thereto as a circumstance in determining their true legal relations as affecting the plaintiff's right to recover as one of the two heirs at law of said Frances.

3. As Paul Jennings and the mother of plaintiff and Frances were slaves, residing in the State of Virginia at the time of the alleged marriage between them, plaintiff's right, as the heir at law of Frances, must depend upon the effect of certain

legislation enacted since the general abolition of slavery, for the purpose of rendering legitimate the offspring of former slaves under certain conditions.

The appellant relies upon certain acts of Congress enacted for the District of Columbia, and also upon an act of the Legislature of Virginia, passed in 1866, which he read in evidence. This is, substantially, in the same words as the act of Congress for the District, enacted also in 1866.

We will first inquire into the effect, upon his rights, of the acts of Congress; for, if protected thereby, it will be unnecessary to examine and decide the very interesting questions arising out the attempted application of the statute of Virginia to persons who, at the time of its enactment, were either dead or had removed from that State.

The first act of Congress was passed July 25, 1866, and reads as follows:

" That all colored persons in the District of Columbia who, previous to their actual emancipation, had undertaken and agreed to occupy the relation to each other of husband and wife, and are cohabiting together as such, or in any way recognizing the relation as still existing at the time of the passage of this act, whether the rites of marriage have been celebrated between them or not, shall be deemed husband and wife, and be entitled to all the rights and privileges, and subject to the duties and obligations, of that relation in like manner as if they had been duly married according to law, and all their children shall be deemed legitimate, whether born before or after the passage of this act. And when the parties have ceased to cohabit before the passage of this act in consequence of the death of the woman or from any other cause, all the children of the woman recognized by the man to be his shall be deemed legitimate." 14 Stat. 536.

That act, with slight change of phraseology, has been incorporated in the Revised Statutes of the District of Columbia, as sections 724, 725, 726.

The second act was passed February 6, 1879, and reads as follows:

" That the issue of any marriage of colored persons, contracted and entered into according to any custom prevailing at the time in any of the States where the same occurred, shall, for all purposes of descent and inheritance and the transmission of both real and personal property in the District of Columbia, be deemed and held to be legitimate and capable of inheriting and transmitting inheritance  *   *   * anything in the laws of such States to the contrary notwithstanding." 20 St. at Large, 282.

In considering the application of those acts to the parties in this case, it must be remembered that the alleged marriage, according to the custom of slavery, occurred in Virginia ; that the alleged wife of Paul Jennings and the mother of plaintiff and Frances died in that State about the year 1843 ; that Paul Jennings acquired his own freedom and that of his children before the purchase of the property in 1856 ; that he removed with them to the District of Columbia about the same time, living with them and recognizing them as his children ; and that he continued to recognize and treat them as such until his death in 1874.

That the legal relation of husband and wife could not exist among slaves, was not an arbitrary rule, prompted by a spirit of cruelty and oppression, but a necessary condition of the institution of slavery whilst it existed. Slaves could make no contracts, own no property ; they were themselves property. The recognition of the duties, obligations and rights of the legal relation of husband and wife was necessarily incompatible with those conditions ; hence they could not exist, and the illegitimacy of slave offspring followed as a logical result.

But, notwithstanding their character as property, they had a clearly recognized status as persons also. In this latter character their cohabitation as " man and wife " had a moral foundation and obligation, always permitted, and usually required, to be preceded by the solemn ceremonies of the church.

When slavery had been abolished, and the right to ac-

quire and transmit property had attached to the former
slaves, justice and humanity, as well as sound public pol-
icy, demanded legislation giving legal sanction, as far as
possible, to the moral obligations of these permissive rela-
tions, and rendering legitimate the offspring thereof.

The spirit of this demand met with early and ready re-
sponse in the legislation of the former slave holding States,
and in that of Congress, for the District of Columbia, in
which great numbers of former slaves had congregated
during and after the civil war.

Legislation dictated by such considerations and with
such beneficial ends in view, ought to receive the broadest
and most liberal interpretation not necessarily incompatible
with its express provisions, so as to include within the
scope of its relief all persons that can be comprehended in
its spirit.

This brings us to the consideration and determination of
the controlling question of the case. Assuming that Paul
Jennings and the plaintiff's mother " had undertaken and
agreed to occupy the relation to each other of husband and
wife " whilst slaves in the State of Virginia ; that the rela-
tion continued to the time of her death ; and that Paul
Jennings, up to the time of his death in the District of Co-
lumbia, had always recognized the plaintiff as his own
child ; the question is : Shall the plaintiff be deemed the
legitimate son of Paul Jennings under the provisions of
either the act of 1866 or that of 1879, quoted above ?

Clearly, the case of the plaintiff is not comprehended in
the first clause of the act of 1866 (now R. S. D. C., secs.
724 and 725), because his mother had never cohabited
with Paul Jennings as his wife, in the District of Columbia,
and had died long before his removal here.  But it comes,
equally as clearly, within the terms of the last clause (now
R. S. D. C., sec. 726), unless these must be limited in their
application to the children of parties who had lived together
as husband and wife in the District ?

Why should the terms of the act be thus limited ?   Why

should we hold that Congress intended to make a distinction between persons situated as the plaintiff was at the time, and those whose parents, similarly wedded, had happened, for a time, to live together in the District?

The act was intended to operate in favor of persons and upon property in the District, by removing legal obstacles in the way of an intrinsically rightful inheritance.

The justice and expediency of legitimating children whose mother had been recognized by the father as his wife to the time of her death, so far as the laws of slavery, in their then place of residence, would permit, and who had been brought to the District and here recognized, declared, and cared for as his own children by that father, were as cogent as in the case of those whose parents had actually lived together, in the same relation, in the District.

Bearing in mind the spirit of interpretation above invoked, and that these people were justly within the mischief to be remedied, and finding no plain expression of a contrary intention, we mnst hold that they were comprehended in the general scope and purpose of the act.

The act of 1879 is broader in its scope than that of 1866, and confers the right to inherit property, in the District of Columbia, upon all persons, no matter where they or their parents may have lived, who might be " the issue of any marriage of colored persons, contracted and entered into according to any custom prevailing at the time in any of the States where the same occurred."

4. Notwithstanding the plain rule of the act of 1879, and the construction given the act of 1866, it is contended, on behalf of the appellee, that the court was, nevertheless, right in directing a verdict for the defendant, because the evidence submitted by the plaintiff was not sufficient to warrant a finding by the jury that the form of marriage contemplated by either statute had ever been contracted by the plaintiff's parents. If, upon examination of the evidence, we find this contention to be well founded, the judgment must stand ; otherwise it must be reversed.

There was no direct proof of an actual marriage. The plaintiff's own testimony that there was such a marriage was necessarily a mere conclusion of his own, founded on hearsay. It is true that the fact of marriage may be proved by the declarations of deceased persons related by blood or marriage to the person; but the proper relationship of the declarant must first be established. *Blackburn* v. *Crawford*, 3 Wall. 175, 187; *Green* v. *Norment*, 5 Mackey, 80; *Anderson* v. *Smith*, 2 Mackey, 275.

It would seem that the knowledge of the plaintiff had been derived from " his uncles in Ohio," with whom he had lived for sixteen years, and who, he said, " knew about it." To make their declarations competent, it should have been shown that they were brothers of Paul Jennings and dead at the time of the trial. Moreover, their declarations should have been given, and not plaintiff's conclusions therefrom. If they were brothers of the mother their declaration would serve no useful purpose, because to make them competent, the fact of their relationship to Paul Jennings would first have had to be established from other sources. *Blackburn* v. *Crawford, supra.*

The fact of marriage, however, may be inferred from circumstances, and in questions of legitimacy, where not inconsistent with other facts in evidence, it may be established by proof of cohabitation and repute. 1 Bishop on Marr. & Div., secs. 439, 443, 457; *Blackburn* v. *Crawford*, 3 Wall. 175, 186, 195.

If a legal marriage between white persons may be inferred, after great lapse of time, from the fact that they cohabited for years as husband and wife, acknowledging that relation and recognizing the offspring of such cohabitation, in order to establish the legitimacy of such offspring and their consequent right to inherit the property of their parents, there seems to be no reason why, as said by Mr. Justice Cox, speaking for the General Term of the Supreme Court of the District, in the case of colored people, formerly slaves, it should not be held " just and proper to infer

marriage from the same state of facts as in the case of white people." *Green* v. *Norment*, 5 Mackey, 80, 88 ; see also *Diggs* v. *Wormley*, 21 D. C. 477 ; *Francis* v. *Francis*, 31 Grattan, 283, 287.

On account of the character of the marriages permitted among slaves, the restrictions upon their visits and cohabitation where they belonged to different masters, the necessity of permission therefor, and the general, if not universal, prohibition of openly immoral cohabitation, we see no reason why greater liberality of inference should not be indulged in their case than in that of free white persons.

In this case, it is apparent that Paul Jennings was a man of intelligence and character, superior to that of his class generally. He lived with the plaintiff's mother openly as his wife, in a house to themselves. Children were born whom he recognized as his. While living with his master in Washington he visited his wife in Virginia for a month at a time and longer. He was with her when she died. These things could not have been unknown to or against the will of their respective masters. Having achieved his freedom after the death of his wife, he continued to recognize the children as his own. Their freedom acquired, too, he brought them to Washington and gave them a home with him. Before dying he made a will giving his property to them, and in its terms showed a tender care for his afflicted daughter, Frances, the sister of plaintiff, and under whom he here claims as an heir at law. Most probably the property in this case involved would have been disposed of also for the benefit of the children, had he not known that by the terms of the deed thereto Frances would succeed to the whole title after his death.

The liberality of the presumption, as intimated above, that may be indulged in a case of this kind, beyond that in the case of free white people, has a foundation in reason as well as in natural justice.

It must be constantly borne in mind that the marriage to be presumed is not a marriage between white persons,

solemnized under the sanction and regulation of law, and ordinarily, if not universally, made a matter of public record. On the contrary, it was what was called a " slave marriage," not regulated by law, but permitted according to the varying rules of different masters. All that is required of the testimony is that it shall be sufficient to warrant the inference, either that Paul Jennings and the mother of plaintiff had undertaken and agreed to occupy the relation to each other of husband and wife; or that they had entered into marriage according to the custom prevailing in Virginia among slaves at the time of the commencement of their voluntary cohabitation.

It would be difficult, we think, to indulge any other presumption from the testimony in this case than that there had been a marriage between the parties such as contemplated in either one or other of the statutes that govern the case.

We are of the opinion that the case should have been submitted to the jury, and that the failure to do so was error, for which the judgment must be *reversed, with costs to the appellant, and a new trial awarded; and it is so ordered.*