NOT DESIGNATION FOR PUBLICATION

No. 127,422

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

In the Matter of the Marriage of

MARNIE LEIGH GRACEY,
*Appellee*,

and

MARWAN AHMAD MOHAMMED ALBAWARDI,
*Appellant*.

MEMORANDUM OPINION

Appeal from Sedgwick District Court; QUENTIN PITTMAN, judge. Oral argument held November 18, 2025. Opinion filed May 22, 2026. Affirmed.

*Ezra I. Young*, pro hac vice, of Ithaca, New York, *Jeffrey N. Lowe*, of Penner Lowe Law Group, LLC, of Wichita, and *Lyndon W. Vix*, of Fleeson, Gooing, Coulson & Kitch, L.L.C., of Wichita, for appellant.

*Justen P. Phelps* and *Richard A. Samaniego*, of Gibson Watson Marino LLC, of Wichita, for appellee.

Before PICKERING, P.J., SCHROEDER and HURST, JJ.

PICKERING, J.: Kansas recognizes both common-law marriages between persons with no previous matrimonial history and common-law marriages between divorced spouses. This case concerns the latter, and we are asked to review the district court's ruling that a common-law marriage did exist between the parties. The party challenging this finding also argues the district court lacked both subject matter and personal

1

jurisdiction over him. Because the answer to whether a common-law marriage existed directly relates to the jurisdiction issues, we must first consider this issue.

In 2020, Marnie Leigh Gracey filed a petition for divorce in Sedgwick County. In her petition, she alleged that she and Marwan Ahmad Mohammed Albawardi were married in 1998, and, although they were divorced in both Colorado and Monaco in 2008, they remained continuously married until 2018 when Albawardi left her. After a five-day evidentiary hearing solely on the issues of subject matter and personal jurisdiction, the court concluded a common-law marriage existed between the parties in Kansas and that it had both subject matter and personal jurisdiction over the parties as a result.

Albawardi now appeals, claiming the district court did not have subject matter or personal jurisdiction to grant Gracey a divorce because the parties were previously divorced and did not live in a marital relationship in Kansas. After a thorough review of the record, we find no error by the district court and affirm.

FACTUAL AND PROCEDURAL BACKGROUND

*Initial Filing and Motions*

On February 18, 2020, Gracey filed a petition for divorce. In her petition, she alleged she and Albawardi were married on July 16, 1998, in Hawaii. She also alleged the parties were married on May 2, 2008, in Dubai, United Arab Emirates. Gracey acknowledged that Albawardi filed for divorce in 2008 in Colorado but alleged she signed the documents "based on the representations made by [Albawardi] that their marriage will continue but the divorce was required to allow [her] to be recognized by Islamic Law." In addition, Gracey acknowledged a 2008 Monaco divorce.

2

Despite the divorces, Gracey alleged the parties "continued to reside together and hold each other out as husband and wife" including in Dubai, "which requires marriage to reside together by law." The petition alleged the parties moved to Cheney in 2015 at the request of Albawardi. The parties engaged in a "living apart together" arrangement. On January 26, 2018, Albawardi ended the relationship.

Gracey alleged three children were born of the marriage. A.A. was born in Dubai in 2009. Twins A.M.A. and R.A. were born in 2016 in Wichita.

On September 11, 2020, Albawardi's attorneys entered an entry of appearance which was limited to challenging jurisdiction. Albawardi also moved to dismiss, challenging his personal service and the district court's subject matter and personal jurisdiction over him. He asserted the petition clearly indicated the parties were divorced both in Colorado and Monaco after both marriage dates (1998 and 2008) and, thus, the district court lacked subject matter jurisdiction over Gracey's divorce action. He also alleged he was not a resident of Kansas as he had never been domiciled in or resided in Kansas and that he lacked minimum contacts with Kansas to allow personal jurisdiction over him. In November 2020, Albawardi filed an amended motion to dismiss, alleging the same arguments.

In March 2021, Gracey responded to the motion to dismiss, claiming she had served Albawardi both in London, England, and in Monaco. She asserted Kansas had personal jurisdiction under K.S.A. 60-308(b)(1)(A) because Albawardi transacted business in Kansas. She also contended that Albawardi owned real estate in Kansas (which is the subject of other pending litigation) and that "Kansas was the last marital domicile of the parties before [Albawardi] ended the relationship and terminated all contact with [Gracey] and the children. Prior to 2018, the parties were in a continuous marital relationship since they married in 1998."

3

Albawardi replied, suggesting that Gracey had raised new factual allegations which did not appear in her petition. His reply addressed a "purported common law marriage" between the parties.

The district court denied Albawardi's motion to dismiss on April 5, 2021. It found Albawardi had been properly served in both London and Monaco. In addition, the district court found it had both subject matter and personal jurisdiction over Albawardi because "[a] common law marriage existed between the parties."

Albawardi moved to alter or amend the judgment. At the hearing on Albawardi's motion, Albawardi asked that the district court clarify or amend its ruling on the motion to dismiss. Albawardi also requested an evidentiary hearing on jurisdiction because "there are apparent genuine issues of material fact in the eyes of the Court and especially the parties themselves and because evidence must be presented to the Court in order to make proper and sufficient findings as to resolution of these judicial and jurisdictional controversies."

The district court ultimately amended its order, finding that Gracey made a prima facie showing that Albawardi was properly served. It also amended its order to indicate Gracey made a prima facie showing that a common-law marriage existed between the parties.

Albawardi moved for clarification of the district court's order. He requested that the district court "clarify that its findings on all jurisdictional issues are not dispositive" and requested an evidentiary hearing on the issues of personal and subject matter jurisdiction. The district court denied the motion for clarification because the order was not final or dispositive. The court, however, ultimately ordered an evidentiary hearing on subject matter and personal jurisdiction.

4

Albawardi filed an answer on October 7, 2021.

The following February, Albawardi moved for judgment on the pleadings. Gracey requested that the motion be stayed pending resolution of the evidentiary hearing Albawardi requested. The district court granted the motion to stay, finding that "[n]othing in [Albawardi's] current motion cannot and will not be addressed at the impending evidentiary hearing."

The district court filed an amended domestic pretrial conference order on May 2, 2022. As part of the pretrial conference order, the parties stipulated that Albawardi was the children's father and that Kansas was the home state for the minor children. The district court listed "[w]hether a marital relationship exists after the Colorado Divorce and Monaco Divorce, including by common law" as an issue to be determined at trial. The district court ordered that "[b]oth parties shall be given sixteen (16) hours to present and defend their case. All party's direct testimony, cross-examination, etc. shall be subtracted from this allotted time."

*The Evidentiary Hearing on Jurisdiction*

The five-day evidentiary hearing began on July 11, 2022. In total, the district court heard testimony from 40 witnesses and received over 20,000 pages of exhibits.

*Gracey's Evidence*

Gracey testified she met Albawardi in the summer of 1997 at the University of Chicago. When they met, Albawardi was going through a divorce. She described an "on again/off again tumultuous relationship for about a year" while Albawardi was attending Harvard. She explained, "[T]he first time that [Albawardi] told me that he loved me, he

then broke up with me. And he told me in that moment, I just wanted you to know it wasn't you. I am expected to marry a Saudi, and you are not Saudi."

In the summer of 1998, Gracey was working for Deutsche Bank in New York City. Albawardi flew from Chicago to New York City and asked her to marry him. His flying back and forth has been a constant pattern since the beginning of their relationship.

Albawardi and Gracey married in July 1998. The name on the marriage certificate was "Marnie L. Gracey Albawardi" but, because the marriage was hidden, it was hard to use Albawardi's last name. Gracey testified the parties lived together in Colorado, Tennessee, the Cayman Islands, and moved to Dubai together. She and Albawardi "always had a place in Dubai from 2001 until we left in 2015." In 2007, Albawardi rented a place in Monaco. Between 2006 and 2015, they resided for periods of time in, at minimum, Dubai and Monaco, and the Cayman Islands.

Gracey told the court that Albawardi "has always traveled," so she was unsure how often Albawardi traveled. She stated, "When I was in Cayman, he would be gone two, three weeks at a time."

In 2008, Gracey underwent in vitro fertilization in Dubai. The following year, she gave birth to A.A. at the American Hospital of Dubai. Gracey testified the family spent the summer in Monaco, along with Merlita, the nanny who was with the family from 2009 until 2018.

In 2015, while the family lived in Dubai, Albawardi unexpectedly suggested another round of in vitro fertilization. Again, the parties presented themselves as married in order to implant the fertilized embryos. Gracey stated that Albawardi:

"wanted us to move back to the United States, and he wanted specifically for us to be in Kansas, because we had the home in Kansas, and because the Cheney school was right there, because my parents were right there, because there was an expectation that I was going to be pregnant and a high expectation potentially with multiples."

Gracey believed part of the motivating factor for returning to the United States was that Albawardi's sister had a brain tumor. In 2015, they returned to a house in Cheney they had previously purchased and renovated. Because Albawardi had to start classes at the University of Chicago quickly, he only stayed in Cheney for a night. He then began traveling back and forth from Cheney to Chicago. From December 2015 until 2020, Albawardi provided Gracey money to pay for the children's expenses.

The twins, A.M.A. and R.A., were born on May 11, 2016. Albawardi was present for the entire intake process and present for the birth of the twins. Albawardi spent a night in the hospital with Gracey. He also handled all of the hospital bills. Albawardi signed for her oxycodone prescriptions as her husband. After Gracey was discharged from the hospital, she and Albawardi returned to the Cheney property.

Gracey testified that Albawardi "absolutely" lived at the Cheney property. She told the court, "His clothes were there. He lived there. We had purchased the Lincoln Navigator. He was the one that picked it." She explained that Albawardi would "get up and go have coffee, and he would usually go to Kaps or Casey's in town. Cheney is a small place."

Although Albawardi was often traveling, he was still home a lot in 2016 and in 2017. The district court asked Gracey if Albawardi resided in Kansas "for at least six consecutive months." She replied, "I would say [Albawardi] hasn't been anywhere in his life for six consecutive months, because he has always traveled extensively." But, "per the travel log and the statistics of where he was in the world, he was in Kansas more than

7

he was anywhere else in the for the last half of—well, 2015, it was kind of equal, and in 2016 and 2017, I believe he was in Kansas more than he was anywhere else in the world during the year." In 2015, Gracey indicated that Albawardi was in Kansas 31 days after September 2015. Albawardi was in Kansas for 106 days in 2016 and for 81 days in 2017.

Albawardi applied to send A.A. to the University of Chicago Laboratory School and, on the application, listed his marital status as married. In addition, Albawardi donated to Radio Kansas and listed the Cheney address as his address.

Gracey believed she and Albawardi were divorced in order to marry in an Islamic ceremony and be able to be together. She testified that the divorce decrees "were not ever to be a separation of our lives, of our marriage, of our assests, of our businesses or anything." The divorce was not intended to be a separation but was "intended to be something so that our marriage could be fully public and welcome the birth of our child."

On cross-examination, Gracey asserted there was no physical evidence of Albawardi's directive that she return to Kansas because it was a verbal request, stating:

> "I was not the one who wanted to move back to Kansas . . . . I moved back to Cheney, Kansas because [Albawardi] wanted to relocate to the United States of America from Dubai, United Arab Emirates. He wanted to come. I did not want to come. [A.A.] did not want to come. We came as a family unit, because he wanted to relocate to the West, and he felt that Kansas was the best place for us. I love my family and my friends, and they are wonderful people, but that is not why I moved back to Cheney, Kansas."

Gracey's father, Dr. Rodger Gracey, also testified. He stated that Albawardi was his "son-in-law." Dr. Gracey cared "a great deal" for Albwardi because he "filled a big void" left by the loss of Dr. Gracey's son. Dr. Gracey also visited Albawardi and Gracey "several times" in Dubai and stayed with them at their apartment. Similarly, Dr. Gracey visited Albawardi and Gracey in Monaco in 2010. Dr. Gracey also took a cruise to

Scandinavia with Albawardi and Gracey in 2015. Albawardi and Gracey stayed together in the stateroom next to Dr. Gracey.

Dr. Gracey testified that Albawardi and Gracey "moved back [to Cheney] in 2015 and then stayed there until the end of 2017, 2018 when [Albawardi] came back and essentially dumped [Gracey.]" Dr. Gracey often picked up Albawardi from the airport, and Albawardi would stay "about every weekend." Dr. Gracey testified he had seen Albawardi living with Gracey between 2015 and 2018.

Others in the community knew Albawardi as Gracey's husband. Albawardi frequently attended church with Gracey, and the church community knew Albawardi. In Cheney, Dr. Gracey would introduce Albawardi as his son-in-law with no objection to that characterization by Albawardi.

Amber Petrie, the family nanny in Cheney, testified she understood that Albawardi lived there but traveled a lot for work and school. Petrie described Gracey and Albawardi's relationship, stating, "They didn't have a lot of physical affection, but I never had any doubt that they were together and that they loved each other dearly." Petrie testified the parties would give each other a kiss on the cheek or hold hands while out with the children and described Albawardi as "very attentive."

Three health providers also testified. Carlie Brack, a registered nurse who assisted with the delivery of the twins, testified that Gracey's medical records indicated Gracey was married and that Albawardi did not contradict that. Dr. Teresa Craddock testified Gracey was her patient while pregnant with the twins. Dr. Craddock indicated Gracey's "husband was there for, I would say, several, five, six or so [prenatal visits.]" Albawardi seemed "supportive and involved. It seemed to be a normal spousal relationship at the time of delivery of children." Dr. Craddock observed Albawardi stayed overnight at the hospital with Gracey. Craddock testified she was led to believe they were married by

9

both Gracey *and* Albawardi. Finally, Dr. Russell Coad, a dentist, testified that his records indicated that Albawardi was married and Gracey and Albawardi "came in" together. Dr. Coad explained that Albawardi listed Gracey as his spouse and "would have filled out his paperwork at the time he was here."

Some Cheney residents gave testimonial evidence of their encounters with Albawardi in Cheney. In particular, a local contractor who worked on the parties' home in Cheney, Martin Kerschen, testified, "They were both staying up there [in the master bedroom.]"

Fatima Hussain, an attorney in the United Arab Emirates, testified members of the opposite sex had to be married in order to live together. Nonmarried opposite-sex parties cannot lawfully live together; thus, it would have been illegal for Albawardi and Gracey to live together as an unmarried couple. Further, to engage in in vitro fertilization, "the husband must acknowledge the conjugal relation by producing an official marriage instrument at the time of the fertilization and implantation of the impregnated ovum." Finally, Hussain explained that "since the father or the mother submit[s] . . . a valid marriage contract to the authority[,] that means they acknowledge this marriage and this marriage is still ongoing."

*Albawardi's Evidence*

According to Albawardi, he separated from Gracey in 2005 and moved to London. He had not lived with Gracey since 2008. He explained that Gracey visited him and he visited Gracey because "[w]e were not on terrible terms." Albawardi suggested that the friendly postdivorce relationship became strained as Gracey "was making it more and more difficult to see the children with more and more demands as to what needs to happen, how it was to happen, and if it could happen."

10

Albawardi denied the existence of an Islamic marriage. He added that the husband in an Islamic marriage can simply declare a divorce from his spouse. Albawardi explained that he was currently married to Emily Albawardi and that they were married in Monaco on February 11, 2022. Before that, he testified he was engaged to Austin Hamilton in 2010.

Albawardi acknowledged he and Gracey had children together; the children were conceived but not born during his marriage to Gracey. Albawardi saw Gracey regularly after the birth of A.A. and frequently stayed with Gracey from 2015 until 2018. But he asserted that he did not remarry Gracey because he had no desire to marry her. He denied holding himself as married but then contradicted himself, stating they did so when it was "convenient" for either one:

> "[T]he public that I know, the people that I interact with, absolutely not. To the extent that we had situations where it was convenient for her or I in the interest of our children, I think we would always do what was necessary. If people made assumptions, we wouldn't argue about it because that would only create tension for the children and/or their environment. So yes, I think we—whenever it was convenient for her or I, we certainly did. From the record, it seems to me it was a lot more convenient to her a lot more than it was for me."

Albawardi testified he did not have a mutual agreement to remarry after 2008 and never had sex with Gracey after their divorce in 2008. Albawardi stated that he would not correct anyone who assumed they were married and testified that "[w]henever it comes to the lives of my children, there's very little I wouldn't do to help them, not inconvenience them, give them opportunity. I may, and I certainly believe I have [represented that I was married]." He acknowledged that he had stated that he was married despite being "lawfully divorced."

11

Albawardi indicated that, "with the exception of when I showed up in Kansas," he held himself out as an unmarried man. He always filed taxes "as single when single and married when married." Albawardi asserted that he never spent the night with Gracey when he was in Cheney, never slept in Gracey's bed, and never had sexual relations with Gracey in Cheney. Albawardi testified he only visited Kansas to see his children and his children's extended family.

Albawardi also presented testimony from witnesses in Colorado, Chicago, Monaco, and elsewhere. These witnesses invariably testified they believed Albawardi to be unmarried and had rarely, if ever, heard of, or seen, Gracey. But many of these witnesses did not know the names of some or all of Albawardi's children.

Albawardi presented various experts who testified Monaco, England, and the Cayman Islands did not recognize common-law marriage.

*The District Court's Order*

On August 1, 2022, the district court filed its decision on subject matter and personal jurisdiction. The district court ruled that the 2008 Colorado and Monaco divorces were valid. The district court also ruled that "the parties were not married [in] 2008 in an undocumented Islamic marriage." However, the district court specifically found: "A valid, Kansas, common law marriage existed between the parties after their divorce and began when they relocated to Cheney, Kansas." As a result, the district court ruled that it had subject matter and personal jurisdiction over Albawardi. The district court also made credibility determinations, finding Gracey and Dr. Gracey "far more credible than [Albawardi] and [Albawardi's] witnesses" regarding both whether the parties formed a present consent to the marriage and whether the parties held themselves out as married.

Albawardi filed a motion for reconsideration. In addition to asking the district court to reconsider the evidence, Albawardi argued that the district court should have required "clear and convincing evidence 'so persuasive as to leave no room for reasonable doubt' that a common-law remarriage existed."

The district court amended its journal entry of trial, adding a factual finding that Albawardi "presented no certificate of marriage or similar document supporting his claim that he is remarried." The district court subsequently filed a Second Amended Journal Entry of Judgment, inserting the word "not" in the following sentence: "The assumption of jurisdiction by Kansas does *not* offend traditional notions of fair play and substantial justice because this assumption is both foreseeable and just given the facts of this case."

*Subsequent Proceedings*

After the district court entered its order, Albawardi's counsel withdrew because they had completed the limited scope of their representation. Albawardi did not appear at a case management conference in December 2022. As a result, the district court issued a warrant for Albawardi's arrest.

On December 18, 2023, the district court held a trial on the merits. Albawardi did not appear or present any evidence. On February 26, 2024, the district court entered an amended journal entry of judgment and decree of divorce. For simplicity, we will refer to the district court's final journal entries on jurisdiction and the merits collectively as the court's "order."

Albawardi appealed.

ANALYSIS

The district court's order initially addressed the existence of a marriage. It first found that the Colorado and Monaco divorces were valid but found that a common-law marriage existed between the parties in Kansas. As a result, the district court concluded it had both personal and subject matter jurisdiction over Albawardi and the parties' divorce proceedings.

Gracey does not appeal the district court's findings that the Colorado and Monaco divorces were valid.

We review the issues in the same order as the district court's ruling.

I.      *The District Court Did Not Err in Finding the Existence of a Common-Law Marriage*

*Standard of review*

The existence of a common-law marriage "is a fact to be proved as other facts." *Driscoll v. Driscoll*, 220 Kan. 225, Syl. ¶ 2, 552 P.2d 629 (1976). When reviewing a mixed question of fact and law, an appellate court applies a bifurcated standard of review. The appellate court generally reviews the factual findings under the substantial competent evidence standard. The conclusions of law based on those findings are subject to unlimited review. *Gannon v. State*, 305 Kan. 850, 881, 390 P.3d 461 (2017).

Substantial competent evidence refers to legal and relevant evidence that a reasonable person could accept as being adequate to support a conclusion. *Granados v. Wilson*, 317 Kan. 34, 41, 523 P.3d 501 (2023). It "does not require evidence to *prove* a fact; rather, it simply requires evidence to sufficiently *support* the fact-finder's

14

conclusion." *State v. Morley*, 312 Kan. 702, 712, 479 P.3d 928 (2021). When determining whether substantial competent evidence exists, "an appellate court must not weigh conflicting evidence, pass on the credibility of witnesses, or redetermine questions of fact." *Granados*, 317 Kan. at 41. Because the appellate court is reviewing a district court's findings of fact, "it must not substitute its own judgment of the facts and assessment of witness credibility for that of the district court, even when it reasonably finds witness testimony 'unpersuasive.'" 317 Kan. at 55.

*Common-Law Marriage in Kansas*

Kansas has recognized common-law marriages for more than a century. *State v. Walker*, 36 Kan. 297, Syl., 13 P. 279 (1887). It "establishes a legally cognizable status that does not depend on religious or civil ceremony for its validity but is created by the consent of the parties." *In re Common-Law Marriage of Heidkamp and Ritter*, 317 Kan. 125, 128, 526 P.3d 669 (2023). A "major reason to recognize a common law marriage is to uphold the expectations of the parties and to protect a dependent who has been in a long term relationship." 1 Elrod, Kansas Law and Practice: Kansas Family Law § 3:7, p. 266 (2025-2026 ed.).

There are three essential elements of a common-law marriage: "(1) capacity of the parties to marry; (2) a present marriage agreement between the parties; and (3) a holding out of each other as husband and wife to the public. . . . The party asserting a common law marriage bears the burden" of proving its existence. *In re Marriage of Kelley*, 321 Kan. 783, 786, 584 P.3d 70 (2026).

Neither party challenges whether the parties had the capacity to marry. Instead, Albawardi makes three challenges to the district court's finding of a common-law marriage. First, he argues that the district court ignored uncontroverted evidence of his subsequent ceremonial marriage to another and that Gracey failed to overcome the

presumption of validity of that subsequent marriage. Second, Albawardi asserts Gracey failed to prove a present agreement to be married. And third, he argues that Gracey failed to meet her burden that the parties held themselves out as married.

*Albawardi's subsequent marriage is not entitled to presumptive validity.*

For his first point, Albawardi asks us to adopt a heightened burden of proof. He argues that a party asserting a common-law marriage must prove the common-law marriage by clear and convincing evidence "where the party defending against common law marriage has entered into a subsequent ceremonial marriage with another." He contends that the evidence overcoming the presumptive validity of a subsequent marriage "in favor of a continuing common law marriage 'must be clear, strong, and satisfactory and so persuasive as to leave no room for reasonable doubt.'" *Chandler v. Central Oil Corp., Inc.*, 253 Kan. 50, 58, 853 P.2d 649 (1993).

Gracey accurately suggests Albawardi's "purported remarriage was an overt attempt to manipulate the legal process." She suggests Albawardi's arguments requesting a heightened burden "should be rejected out of hand" and that we should not presume the validity of Albawardi's subsequent marriage.

Kansas law recognizes the presumption of validity of a subsequent marriage. Further, "the presumption of validity of a subsequent marriage includes, if necessary, the fact of dissolution of a previous marriage." *Harper v. Dupree*, 185 Kan. 483, 488, 345 P.2d 644 (1959). Indeed, as early as 1911, the Kansas Supreme Court held that "when a second marriage has been entered into in good faith and all parties have acted on the assumption that the first is no longer in force, the natural inference and the prevailing presumption is that no legal impediment existed to entering into the new matrimonial relation." *Shepard v. Carter*, 86 Kan. 125, 130, 119 P. 533 (1911).

16

Albawardi's arguments are unpersuasive for two reasons. First, in *In re B.D.-Y.*, 286 Kan. 686, Syl. ¶ 3, 187 P.3d 594 (2008), the Kansas Supreme Court redefined "clear and convincing evidence" as "evidence which shows that the truth of the facts asserted is highly probable." In doing so, the court noted that "[a]ll contrary holdings of this court are disapproved," including the language in *Chandler*. *In re B.D.-Y.*, 286 Kan. at 698. Thus, Gracey needs to simply show that it was "highly probable" she and Albawardi were in a common-law marriage to overcome the presumption of validity of his subsequent marriage.

Second, and more important, we decline to extend a presumption of validity to Albawardi's subsequent marriage based on the timing of such marriage. His subsequent marriage did not occur before Gracey filed her petition for divorce. In fact, Albawardi did not remarry until February 11, 2022, two years after Gracey filed her petition for divorce. And Albawardi's marriage ceremony occurred nearly a year after the district court denied Albawardi's motion to dismiss, in which the court found that "[a] common law marriage existed" between the parties. Similarly, Albawardi's subsequent marriage did not occur until nearly six months after the district court granted Albawardi's request for an evidentiary hearing limited to the issues of subject matter and personal jurisdiction.

In sharp contrast, in every case cited by Albawardi, the subsequent marriage occurred before the litigation at issue. See e.g., *Harper*, 185 Kan. at 484 (husband attempted to annul seven-year marriage based on wife's failure to divorce common-law spouse). In many cases, one of the alleged spouses was deceased. See, e.g., *Chandler*, 253 Kan. at 58 (two women arguing over who was surviving spouse entitled to worker's compensation award for worker killed on job); *Titus v. Titus*, 151 Kan. 156, 158, 97 P.2d 1113 (1940) (question of who was surviving spouse entitled to husband's estate); *Kinney v. Woodmen of the World*, 110 Kan. 323, 326, 203 P. 723 (1922) (question of whether parties were common-law married to entitle receipt of life insurance policy).

Indeed, the subsequent marriage raises concerns about Albawardi's good faith in entering into the marriage. Given the timing of his subsequent marriage ceremony of February 11, 2022, it would be inequitable to hold Gracey to a higher evidentiary standard based on a marriage that occurred after the divorce proceeding was filed and the district court ordered an evidentiary hearing.

*Substantial competent evidence supports the district court's finding of a present agreement to be married.*

On appeal, Albawardi makes three arguments to suggest that the district court erred when it found a present agreement to be married. First, he asserts the parties could not have been married because Gracey "insisted the parties continued to be married" despite the earlier divorces. Next, he argues that the district court erred when it held his "acknowledgement and support of his children evidenced he was a 'father and husband.'" Finally, Albawardi contends the district court erred by construing Gracey's belief in a marriage between 2015 and 2018 to indicate he had a similar agreement to be remarried to Gracey. Albawardi suggests Gracey has not met her burden because she relies on her "self-serving testimony" and the beliefs of third parties to show a present agreement to be married.

In determining whether a common-law remarriage exists between divorced spouses, "the same tests and standards used in determining whether persons with no previous matrimonial history have entered into a common law marriage are to be applied." *In re Estate of Keimig*, 215 Kan. 869, 872, 528 P.2d 1228 (1974). That is, the same three elements must be present. A present agreement to marry "need not be in any particular form," but both parties must have "a present mutual consent" to the marriage. *Driscoll*, 220 Kan. at 227. A present agreement to be married need not be express but may be implied from the parties' conduct and declarations. *Renfrow v. Renfrow*, 60 Kan. 277, 281, 56 P. 534 (1899). In other words, a present agreement to be married may be

18

shown by circumstantial evidence. *Fleming v. Fleming*, 221 Kan. 290, 291, 559 P.2d 329 (1977).

Here, the district court found the parties formed a present marriage agreement. Although the court acknowledged a present intention to be married is "difficult to prove because intent is subjective[,]" nonetheless, the district court specifically noted that Gracey considered herself married during their time in Cheney. The district court also found Albawardi's behavior "led members of that community . . . to believe the couple was married because they were married." The court noted that Albawardi led Gracey's father to believe the parties were married.

We also cannot overlook the district court's credibility findings. The district court found Gracey and Dr. Gracey's testimony "far more credible than" the testimony of Albawardi and his witnesses "regarding the question of whether the parties formed a mutual present consent to the marriage." We cannot reweigh the evidence and "must not substitute [our] own judgment of the facts and assessment of witness credibility for that of the district court." *Granados*, 317 Kan. at 55. Instead, we may only consider whether evidence "sufficiently *support*[s] the fact-finder's conclusion." *Morley*, 312 Kan. at 712.

> "In reviewing the decision of a trial court, this court must accept as true the evidence and all inferences to be drawn therefrom to support the findings of the trial court, and must disregard any conflicting evidence or other inferences that might be drawn therefrom. Findings of fact shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge the credibility of the witnesses." *In re Estate of Antonopoulos*, 268 Kan. 178, 193, 993 P.2d 637 (1999).

Citing *In re Estate of Keimig*, Albawardi argues that there must be a new agreement to remarry after a divorce and that "[s]imply relying upon the initial marriage agreement, terminated by divorce, does not suffice." But *In re Estate of Keimig* does not state that. There, Ruth and Walter were married in 1925, and Ruth obtained a divorce in

1935. The parties then reunited and held each other out as husband and wife for nine years before Ruth left and began living with another man, Albert, holding him out as her husband. After Ruth left, Walter also dated other women and eventually married Goldie in a civil ceremony. After Walter's death, Ruth and Albert were ceremoniously married. Ruth then filed for a spousal election in Walter's probate case. The district court found Ruth "failed to show the establishment of a common law marriage with Walter A. Keimig subsequent to their divorce, in that [Ruth] did not show a marriage agreement in addition to an agreement to cohabit." 215 Kan. at 871. The district court also found Ruth failed to overcome the presumption of validity of Walter and Goldie's subsequent marriage.

On appeal, our Supreme Court found:

"Although the evidence revealed a considerable period of living together as man and wife we cannot say the trial court was compelled or required by it or by all the evidence to find that [Ruth] and Walter actually contemplated or entered into a new agreement to become husband and wife at the critical time in question. They did not say so and, aside from their holding out, their subsequent conduct belied the fact. They may have considered remarriage in the future if and when that became mutually agreeable. Each definitely considered himself single for a period of time after their twice repeated separation and each became interested in new marital partners to the extent of a long time holding out by [Ruth] as the wife of another, of whom she sought formal riddance by divorce, and of a ceremonial marriage by Walter. . . . [Ruth's] inconsistency in her marital positions was such as to render her entire testimony suspect. The most that can be said in her favor is that a factual issue was presented by reason of differing interpretations which could be placed upon all the evidence and the trial court after hearing it resolved any conflict by finding there was no present marriage agreement when [Ruth] and Walter resumed cohabitation. We simply cannot say there was no substantial evidence in support thereof and the finding must be approved." 215 Kan. at 873-74.

The Supreme Court found there was substantial competent evidence to support the district court's finding that there was no present marriage agreement. This was, in part,

based on the district court's determination that Ruth's testimony was not credible based on both parties' conduct after their initial divorce. Despite Albawardi's contention to the contrary, *In re Estate of Keimig* simply states that the parties' conduct can create a fact question as to whether there was a present agreement to be married. 215 Kan. at 873-74.

Albawardi cites *Whetstone v. Whetstone*, 178 Kan. 595, 290 P.2d 1022 (1955), to argue the district court erred when it "construe[d] testimony from third parties who believed that the parties were married as evidencing a present marriage agreement." Albawardi's reliance on *Whetstone* is misplaced. There, the plaintiff testified the parties did not conduct themselves as man as wife; he never held himself out as married to his purported spouse; and, to his knowledge, she never held herself out as married either. In fact, the plaintiff testified, "'I never said I was legally married.'" 178 Kan. at 597.

*Whetstone* does state that "[t]he general reputation of the parties with respect to being married or single does not prove or disprove the marriage agreement itself." 178 Kan. at 596. But the Supreme Court found: "It is apparent from the record in this case that the plaintiff failed to prove any existing common-law marriage relationship between the parties and, as a consequence, there was no marriage to be dissolved." 178 Kan. at 597.

Albawardi also argues the district court erred when it found his "acknowledgment and support of his minor children evidenced he was a 'father and husband.'" To be clear, this is a mischaracterization of the court's ruling. This rationale was not cited by the district court as a reason to find a present marriage agreement between the parties.

Finally, Albawardi asserts the district court erred by accepting Gracey's testimony that she believed the parties to be married between 2015 and 2018 as evidence he had a present agreement to be married to her. He asserts that Gracey had the burden of proving a common-law marriage and, citing *Arrington v. State*, No. 75,770, 1997 WL 35435518

21

(Kan. App. 1997) (unpublished opinion), suggests that a proponent cannot meet that burden when the proponent "provides little more than self-serving testimony, which must be afforded little probative value."

This argument falls short. Notably, *Arrington* is distinguishable. There, Arrington was convicted of two counts of indecent liberties with a minor and two counts of aggravated criminal sodomy, wherein the victims were his companion's daughters. Two years later, in *State v. Williams*, 250 Kan. 730, 736-37, 829 P.2d 892 (1992), the Kansas Supreme Court held that aggravated incest was a more specific crime that applied instead of indecent liberties with a minor when the offender was related to the victim. After that holding, Arrington sought a divorce, alleging a common-law marriage, and the district court granted the divorce. Then Arrington filed a K.S.A. 60-1507 motion alleging he was the victims' stepfather and should have been convicted of aggravated incest instead of the general crimes he was convicted of. The district court disagreed and denied his K.S.A. 60-1507 motion.

On appeal, another panel of this court affirmed the district court. *Arrington*, 1997 WL 35435518, at *2. The panel noted that, during Arrington's criminal trial, no one suggested a marital relationship between Arrington and the victims' mother. The only evidence to suggest Arrington was the victims' stepfather occurred after the *Williams* decision. The *Arrington* panel concluded that it "will not disturb the district court's finding that Arrington failed to meet his burden to establish that he was the victims' common-law stepfather at the time of his offenses." 1997 WL 35435518, at *2. Unlike *Arrington*, this case involves a contemporaneous common-law marriage claim. And unlike *Arrington*, there was substantial evidence presented to support the existence of a common-law marriage.

Here, substantial competent evidence supports the district court's findings that there was a present agreement to be married. The district court found Gracey's and Dr.

22

Gracey's testimony was "far more credible" than Albawardi's testimony on the issue. After the birth of the twins, Albawardi signed for Gracey's oxycodone prescription as her husband. Dr. Gracey testified he made it a point to introduce Albawardi as his son-in-law after the parties moved back to Kansas, and Albawardi accepted the introduction as Dr. Gracey's son-in-law. Albawardi's applications for A.A. to attend North Shore Country Day School and the University of Chicago's Laboratory School indicated the parties were married.

Brack testified that Gracey's medical records stated she was "accompanied by spouse" and that she "lives with her spouse." Although that information came from Gracey, Albawardi was in the room and was able to hear the questions and Gracey's responses. Dr. Craddock testified Albawardi led her to believe the parties were married. Similarly, Dr. Coad testified Albawardi identified himself as married.

Additionally, Petrie testified that Albawardi introduced himself as Gracey's husband and the children's father. Petrie also testified Albawardi referred to Gracey as his wife while getting passport photos taken for the twins. And although he traveled frequently for work and school, Albawardi lived with the family. Albawardi would come down from the master bedroom and was usually there when Petrie arrived. Petrie similarly testified that Gracey and Albawardi would hold hands together on family outings and kissed each other's cheeks. Petrie told the court that Albawardi and Gracey did not act like a divorced couple.

Albawardi presented conflicting evidence, and the district court found that Albawardi and his witnesses were less credible than Gracey and Dr. Gracey. Accepting the district court's credibility determinations and without reweighing the evidence, we conclude that substantial competent evidence supports the district court's finding that the parties had a present agreement to be married while in Kansas. See *Granados*, 317 Kan. at 41, 55.

*Substantial competent evidence supports the district court's finding that the parties held themselves out as married.*

The third element necessary to show a common-law marriage is that the parties must hold each other out as husband and wife to the public. *In re Marriage of Heidkamp and Ritter*, 317 Kan. at 128. The parties' reputation as married or single is "evidence which may be considered in determining whether the parties held themselves out to the public as being husband and wife." *In re Estate of Freeman*, 171 Kan. 211, 213, 231 P.2d 261 (1951). It is insufficient to establish a common-law marriage if the parties only hold themselves out as married when it is "advantageous" to them. *State v. Johnson*, 216 Kan. 445, 449, 532 P.2d 1325 (1975).

The district court found that the parties lived together at the Cheney residence, Albawardi was known in the community, and Albawardi "routinely held himself out as [Gracey's] husband." The district court noted Albawardi spent more time in Kansas between September 14, 2015, and the end of 2017 than anywhere else. Albawardi provided Gracey health insurance, monthly bill payments, purchased a family membership to the YMCA and Sedgwick County Zoo, and listed himself and Gracey as married on applications to have A.A. attend prestigious schools in Chicago. Finally, the district court noted that Albawardi identified himself as Gracey's husband to doctors and nurses who assisted in the delivery of the twins and while obtaining Gracey's medicine after the birth of the twins.

Albawardi asserts the evidence cited by the district court is insufficient to find the parties "consistently and persistently held themselves out as married." He contends that financial support for Gracey is simply evidence he loved his children. He argues the testimony of Cheney residents and friends of Gracey "is of limited probative value" because "these witnesses testified not that [Albawardi] held himself out as [Gracey's] husband after their 2008 divorces, but instead that [Gracey] *told them* she was still

24

married to [Albawardi]." He suggests that the record is "critically missing" any evidence he held himself out as married to Gracey over the alleged period of the common-law marriage. This argument, however, is unpersuasive. The district court specifically determined that Gracey was more credible than Albawardi. We determine whether substantial competent evidence exists but cannot "weigh conflicting evidence." *Granados*, 317 Kan. at 41.

Every Cheney resident who testified stated they believed Gracey and Albawardi to be married. Both Stanley and Carolyn Koster believed the parties to be married. Kerschen testified he had the sense Gracey and Albawardi were a married couple. As earlier discussed, Petrie stated that Albawardi introduced himself to her as Gracey's husband and referred to Gracey as his wife while getting passport photographs taken for the twins. She noted that while they did not share "a lot of physical affection," she "never had any doubt that they were together and that they loved each other dearly." Howard Bishop also believed Albawardi and Gracey were married and that Albawardi lived at the Cheney property too. Albawardi never indicated to Jonathan Bowman that he did not live with Gracey. And the record reflects Albawardi spent more than 200 days in Kansas between 2015 and the end of 2017.

Medical personnel testified similarly. Brack testified Albawardi was present and did not correct Gracey when Gracey responded that she was "accompanied by [her] spouse" and that she "lives with her spouse." As noted earlier, Dr. Craddock stated Albawardi led her to believe the parties were married and indicated that "[i]t seemed to be a normal spousal relationship at the time of delivery of children." Albawardi identified himself as married to Gracey when he picked up her prescription following delivery of the twins. Dr. Coad also testified that Albawardi identified himself as married.

25

Additionally, Albawardi indicated the parties were married through his paid family membership to the Sedgwick County Zoo, the YMCA, and his applications for A.A. to attend prestigious Chicago-area schools.

Overall, though Albawardi presented conflicting testimony, the district court specifically found his testimony, and the testimony of his witnesses, were less credible than Gracey's. Substantial competent evidence supports the district court's findings that Gracey and Albawardi held themselves out as married.

*Response to the dissent*

The dissent cites *Duran v. Christena*, No. 128,485, 2026 WL 546968, at *1 (Kan. App. 2026) (unpublished opinion). But *Duran* is not as persuasive as the dissent suggests. First, the district court made a negative finding—that there was no common-law marriage. As the *Duran* panel notes: "Appellate courts reviewing a negative finding will uphold it unless the challenging party proves the district court arbitrarily disregarded undisputed evidence or relied upon '"some extrinsic consideration such as bias, passion, or prejudice"' to reach its decision." 2026 WL 546968, at *4. In other words, *Duran* applied a different standard of review than in this case.

Second, the district court in *Duran* found that "Christena's uncontroverted testimony showed that the 'holding out' was intended only to gain a financial benefit from third parties." 2026 WL 546968, at *3. The dissent cites *Duran*'s facts, and the district court's findings, that the "memberships, tax applications, and health insurance was 'for the secondary gain and not a demonstration of their relationship,' which did not reflect 'evidence of a mutual agreement of the parties to be common-law married.'" Slip op. at 41. The *Duran* panel did not analyze the role of these documents, instead simply stating it "agree[d] with the district court—there is insufficient evidence of a present agreement to

26

marry that would lead us to find that a common-law marriage exists here." 2026 WL 546968, at *5.

Last, the *Duran* panel noted there was "conflicting evidence" regarding a present agreement to be married but found "substantial competent evidence support[ed] the district court's finding." 2026 WL 546968, at *5. As we read the *Duran* panel's opinion and the cases it cites, had the district court reached the opposite conclusion and found a common-law marriage existed, it seems substantial competent evidence would have supported that finding as well. The parties presented conflicting evidence and, had the district court weighed the evidence differently, Christena would likely be the appellant.

Although it does not appear the district court in *Duran* made an explicit credibility determination, the district court effectively found Christena—the party denying the existence of a common-law marriage—more credible than Duran, its proponent. The opposite is true here. That is, the district court explicitly found Gracey and her witnesses were more credible than Albawardi and his witnesses that Gracey and Albawardi entered into a common-law marriage in Kansas—a state that recognizes common-law marriage.

*Conclusion*

We conclude that Gracey and Albawardi were in a common-law marriage. The district court found, and neither party challenged, that the parties had capacity to marry. Substantial competent evidence supports the district court's findings that there was a present agreement to be married and that the parties held themselves out as married. Here, the three elements of a common-law marriage were met: (1) the capacity to marry; (2) a present marriage agreement; and (3) holding themselves out to the public as married. *In re Marriage of Heidkamp and Ritter*, 317 Kan. at 128. Thus, a common-law marriage between Gracey and Albawardi existed.

27

II.     *The District Court Did Not Err When It Denied Albawardi's Motion to Dismiss for Lack of Subject Matter and Personal Jurisdiction*

*Standard of review*

The parties disagree on the appropriate standard of review. Citing *POM of Kansas LLC v. Kobach*, 319 Kan. 764, 561 P.3d 506 (2024), Albawardi asserts we review personal and subject matter jurisdiction de novo with no deference to the district court's evaluation. He similarly cites *In re Marriage of Brizendine and Randall*, No. 115,265, 2017 WL 836827 (Kan. App. 2017) (unpublished opinion), for the proposition that an appellate court reviews the district court's decision on a motion to dismiss with no deference to the district court.

Gracey contends Albawardi cites the standard of review for preevidentiary hearing rulings but asserts that standard of review is inapplicable because the district court made factual findings. She suggests we should review whether the district court's factual findings are supported by substantial competent evidence and review whether those findings are sufficient to support the district court's conclusions of law. See *Iola State Bank v. Bolan*, 235 Kan. 175, 187, 679 P.2d 720 (1984).

In reply, Albawardi argues Gracey misrepresents the evidentiary burden to which she was held because the district court granted a default divorce decree. But the district court held a five-day evidentiary hearing solely on the issue of jurisdiction—a hearing in which Albawardi both participated and testified. The court made numerous findings of fact and conclusions of law following that evidentiary hearing. These are the factual findings Gracey cites throughout her brief. To suggest the district court's jurisdictional findings were based on default is surprising. Frankly, it is unclear if Albawardi simply misunderstood Gracey's argument.

28

We review the district court's factual findings to determine whether they are supported by substantial competent evidence and are sufficient to support the district court's conclusions of law, but we review the district court's conclusions of law based on those facts de novo. See *State v. Peters*, 319 Kan. 492, 499, 555 P.3d 1134 (2024) (applying standard of review to claims of ineffective assistance of counsel following evidentiary hearing); *State v. Garrett*, 319 Kan. 465, 469, 555 P.3d 1116 (2024) (applying standard of review to motion to suppress); *State v. Shelly*, 303 Kan. 1027, 1035-36, 371 P.3d 820 (2016) (applying standard of review to *State v. Ortiz*, 230 Kan. 733, 640 P.2d 1255 [1982] rulings). This standard of review preserves both the district court's role as factfinder and our unlimited review of the district court's legal conclusions.

Substantial competent evidence refers to legal and relevant evidence that a reasonable person could accept as being adequate to support a conclusion. *Granados*, 317 Kan. at 41. It "does not require evidence to *prove* a fact; rather, it simply requires evidence to sufficiently *support* the fact-finder's conclusion." *Morley*, 312 Kan. at 712. When determining whether substantial competent evidence exists, "an appellate court must not weigh conflicting evidence, pass on the credibility of witnesses, or redetermine questions of fact." *Granados*, 317 Kan. at 41. A district court's "[f]indings of fact shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge the credibility of the witnesses." *In re Estate of Antonopoulos*, 268 Kan. at 193.

*The district court had subject matter jurisdiction over the action.*

Broadly speaking, there are two types of personal jurisdiction: general jurisdiction and specific jurisdiction. See *Aeroflex Wichita, Inc.*, 294 Kan. at 273. Subject matter jurisdiction refers to a court's power "'to hear and decide a particular type of action.'" *In re Marriage of Allen*, 31 Kan. App. 2d 31, 32, 59 P.3d 1030 (2002). "The subject-matter jurisdiction of Kansas district courts . . . generally extends to actions for divorce.

29

Furthermore, the Kansas Legislature specifically authorizes Kansas district courts to divide marital property as part of a divorce. [Citations omitted.]" *In re Marriage of Williams*, 307 Kan. 960, 970, 417 P.3d 1033 (2018).

Albawardi argues that the Colorado and Monaco divorces terminated the alleged 1998 and 2008 marriages and those issues cannot be relitigated. But Gracey did not appeal the district court's conclusion that the Colorado and Monaco divorces were valid. As a result, these issues are not properly before us. See *Cooke v. Gillespie*, 285 Kan. 748, 755, 176 P.3d 144 (2008).

Rather, the subject matter jurisdiction issue that is properly before us as framed by Albawardi is whether "[t]he alleged ceremonial marriages foreclosed [Gracey] from later pleading a common law marriage." Albawardi contends that "[a] common law marriage cannot be found where the proponent simultaneously insists that she seeks divorce from a ceremonial marriage." As such, he asserts that "Gracey's divorce petition alleged particulars that foreclosed the legal possibility of later alleging a common law marriage in lieu of a ceremonial marriage." Finally, he argues that "there is no other case, reported or not, in Kansas where a trial court has imposed an unalleged common law marriage upon the parties."

Albawardi suggests *Blackburn v. Crawfords*, 70 U.S. 175, 18 L. Ed. 186 (1865), held that a common-law marriage was inconsistent with a ceremonial marriage. But *Blackburn* does not make that holding. In *Blackburn*, Elizabeth Taylor testified she married T.B. Crawford at St. Patrick's Church by a specific reverend on a particular day. No one, including Taylor, provided evidence the parties were married in any other way or at any other time. But the court instructed the jury: "'If the jury find that T.B. Crawford and Elizabeth Taylor were married *at any time*, . . . then their verdict must be for the plaintiff.'" 70 U.S. at 185. The *Blackburn* Court held that the court erred by submitting to the jury a question of "whether there was not a marriage at a different time and place, and

contracted in a different manner" than alleged by Taylor and that Taylor's "*testimony* was clear and positive. It was wholly inconsistent with such a proposition. If there [was] none as alleged by her, clearly there was none at any time." (Emphasis added.) 70 U.S. at 194.

Yet, the *Blackburn* Court did not hold that a common-law marriage was "wholly inconsistent" with a ceremonial marriage. It held that since Taylor testified only to the existence of a ceremonial marriage at trial, asking the jury to consider whether the parties were married at a different time or place was error. 70 U.S. at 194.

Similarly, Albawardi cites *In re Estate of Keimig* to suggest that the Kansas Supreme Court has "echoed" *Blackburn*'s holding and held "a proponent's 'inconsistency in her marital positions' opportunistically alleging she entered into a single marriage by both ceremony and common law, shows she entered into no marriage at all." Again, Albawardi's argument cherry-picks language to support his argument, as the Supreme Court did not hold as Albawardi alleges. The *In re Estate of Keimig* court found:

> "Appellant's inconsistency in her marital positions was such as to render her entire testimony suspect. The most that can be said in her favor is that a factual issue was presented by reason of differing interpretations which could be placed upon all the evidence and the trial court after hearing it resolved any conflict by finding there was no present marriage agreement when appellant and Walter resumed cohabitation. We simply cannot say there was no substantial evidence in support thereof and the finding must be approved." 215 Kan. at 873-74.

In other words, *In re Estate of Keimig* does not hold that, as a matter of law, alleging a marriage by both the common-law and a ceremonial marriage shows that no marriage existed at all. Instead, our Supreme Court recognized that the district court determined that Ruth's testimony was not credible based on both parties' conduct after their initial divorce. It held that the parties' conduct created a factual question as to

31

whether there was a present agreement to be married, and substantial competent evidence supported the district court's finding that there was no marriage. 215 Kan. at 873-74.

The evidentiary hearing on the jurisdictional issues raised by Albawardi strengthened Gracey's argument. That is, Albawardi's argument would have been stronger had the district court not held an evidentiary hearing on the jurisdictional issues that he had raised.

Following a five-day evidentiary hearing, the district court concluded there was a valid common-law marriage. And, on appeal, Albawardi cites no cases holding that a common-law marriage is precluded by the existence of a believed ceremonial marriage. The district court had subject matter jurisdiction over the action.

*The district court had personal jurisdiction over Albawardi.*

"Specific jurisdiction refers to jurisdiction over causes of action arising from or related to a defendant's actions within a forum state." *Aeroflex Wichita, Inc.*, 294 Kan. at 273. Under the Kansas long-arm statute, K.S.A. 60-308(b)(1), "[a]ny person, whether or not a citizen or resident of this state, who in person . . . does any of" 12 acts—which includes living in a marital relationship in this state—"thereby submits the person . . . to the jurisdiction of the courts of this state for any claim for relief arising from the act." Thus, a person "living in a marital relationship in this state notwithstanding subsequent departure from this state" is subjected to the jurisdiction of Kansas courts "for maintenance, child support, or property settlement . . . if the other party to the marital relationship continues to reside in this state." K.S.A. 60-308(b)(1)(H).

If personal jurisdiction exists under the Kansas long-arm statute, a court must then determine whether "the exercise of personal jurisdiction complies with the due process requirements of the Fourteenth Amendment to the United States Constitution." *Kluin v.*

*American Suzuki Motor Corp.*, 274 Kan. 888, 894, 56 P.3d 829 (2002). But we need not consider a due process argument if it is not raised on appeal. See *In re Marriage of Williams*, 307 Kan. at 966. Albawardi has not raised a due process argument before us, so we need not consider it.

On appeal, Albawardi first argues the district court erroneously "imputed" Gracey's domicile to Albawardi. Specifically, Albawardi contends the district court "wrongly presumed" Gracey's decision to relocate to Kansas was evidence of his intention to relocate and reside in Kansas. He claims that Gracey's "unilateral conduct" cannot be evidence of his decision to domicile in Kansas, citing *Hanson v. Denckla*, 357 U.S. 235, 253, 78 S. Ct. 1228, 2 L. Ed. 2d 1283 (1958), for support. He contends his "support payments and travel to Kansas to visit his minor children cannot convey personal jurisdiction over him in a divorce," relying on *Whisenant v. Whisenant*, 219 Kan. 387, 394, 548 P.2d 470 (1976), and *In re Marriage of Johnston*, No. 103,498, 2011 WL 5027086, at *4 (Kan. App. 2011) (unpublished opinion).

Albawardi cites *Perry v. Perry*, 5 Kan. App. 2d 636, 639, 623 P.2d 513 (1981), for the proposition that "'lived in a marital relationship' is the equivalent of 'established a marital domicile.'" But in *In re Marriage of Brown*, 247 Kan. 152, 162, 795 P.2d 375 (1990), the Kansas Supreme Court concluded that "the question in determining whether in personam jurisdiction is appropriate in [divorce] cases should be whether the absent defendant lived in a marital relationship within the state to an extent sufficient to meet the constitutional minimum contacts requirements . . . ."

Here, the district court found that Albawardi resided in Kansas as part of a common-law marriage. The court concluded that, although Albawardi "is a non-resident of Kansas now, . . . he did live in Kansas in a marital relationship with [Gracey] (notwithstanding a subsequent departure from Kansas) for a portion of the valid, common law marriage and the parties did establish a marital domicile."

33

Substantial competent evidence supports the district court's findings that the parties established a common-law marriage in Kansas and that Albawardi resided in Kansas during the common-law marriage. Between September 14, 2015, and the end of December 2017, Albawardi spent more time in Kansas than he stayed in any other location, including Illinois, where he was a student.

Accepting the district court's factual findings as true, we find the district court clearly had personal jurisdiction over Albawardi under K.S.A. 60-308(b)(1)(H). Gracey continues to live in Kansas. Under K.S.A. 60-308(b)(1)(H), anyone who has lived in a marital relationship in Kansas "notwithstanding subsequent departure from this state" submits to the jurisdiction of Kansas courts for any claim of relief arising from the marital relationship "if the other party to the marital relationship continues to reside in this state."

III.  *Gracey's Request for Attorney Fees*

After oral argument, Gracey timely moved for attorney fees under Supreme Court Rule 7.07(b)(1). Under this rule, "[a]n appellate court may award attorney fees for services on appeal in a case in which the district court had authority to award attorney fees." 2026 Kan. S. Ct. R. at 52. Gracey requests an amount in the sum of $80,748.45, which encompasses her attorney fees incurred on appeal.

Gracey asserts that "justice, equity, and fairness dictate an award of attorneys fees," specifically due to Albawardi engaging in "bad faith behavior at the trial court level" and stating that she has had to spend a significant amount on attorney fees while Albawardi "refuses to provide any type of financial support in response to the trial court's judgment."

34

The reasons that Gracey provides, however, in part relate back to Albawardi's behavior at the district court level. She cites Albawardi engaging in bad faith behavior at *the district court* and his "refusal to provide any type of financial support in response to the trial court's judgment." Gracey also cited Albawardi's actions that resulted in "extreme" delays on appeal. She points to his request for extensions and requests for transcripts for hearings that were "not needed for the issues that he was raising on appeal[.]" She argues that, due to these actions, the appeal process was delayed.

We are, however, unable to find bad faith on his part in requesting extensions that resulted in a lengthy appellant's brief. Albawardi reasonably requested three 30-day extensions and then moved for a short 5-day extension on the brief due date. He also requested transcripts relating to hearings where all the parties were not present. Nor do we find that the time Albawardi needed to complete his appellant's brief prejudiced Gracey to the point where she is entitled to an award of attorney fees. None of these reasons are persuasive. We deny the motion for attorney fees.

Affirmed.

* * *

HURST, J., dissenting: I respectfully dissent. Where the majority finds substantial competent evidence that the parties both intended to be married sometime between 2015 and January 2018, I find only evidence of intermittent cohabitation, coparenting, and perhaps even a romantic relationship. While the evidence may support the finding that Gracey had an intent to be married, it does not support a finding that Albawardi shared that intent. The purpose and intent of recognizing common-law marriage is not to force those who intentionally, knowingly, and purposefully choose a nonmarital relationship to be subject to marital law. Rather, common-law marriage is intended to recognize a marital relationship when the parties so intended.

35

The history and evolution of common-law marriage has many purposes, and Kansas has chosen to continue with its application despite some of its pitfalls, and where other states have forgone its recognition because of the ease of statutory or ceremonial marriage. See *In re Marriage of Kelley*, 321 Kan 783, 786, 584 P.3d 70 (2026); Thomas, *Common Law Marriage*, 22 J. Am. Acad. Matrim. Law. 151, 156-57, 160 (2009).

Gracey testified the parties lived together in Colorado, Tennessee, the Cayman Islands, and Dubai before moving to Kansas. The majority agreed with the district court's finding that a common-law marriage between Gracey and Albawardi existed or was created in Kansas—and no other jurisdiction—that began sometime between 2015 and January 2018. However, neither the district court nor the majority point to any specific time when Gracey lived in Kansas where the parties—that is both Gracey and Albawardi—formed the intent and mutual agreement to be married or remarry. While the lack of such a timeframe does not dispositively refute a finding that the parties intended to and did form a common-law marriage in Kansas—it is important here because Gracy and Albawardi were statutorily married in 1998 and statutorily divorced in 2008. The divorces occurred in both Colorado and Monaco, about seven years before Gracey relocated to Kansas.

In Kansas, the same three elements—capacity to marry, present agreement to be married, and holding oneself out as married—must be established to support a common-law marriage finding regardless of whether the parties were previously divorced. 1 Elrod, Kansas Law and Practice: Kansas Family Law § 3.8 (2025-2026 ed.); see also *Burnett v. Burnett*, 192 Kan. 247, 250, 387 P.2d 195 (1963) ("[W]here the parties continue to live together as husband and wife after the marriage restrictions are removed they become husband and wife in fact under the common-law."). However, divorced parties who reside together and seemingly exhibit "at least some of the characteristics normally appertaining to more formally married couples" must still have the present intent to be married. *Schrader v. Schrader*, 207 Kan. 349, 349-50, 484 P.2d 1007 (1971),

*disapproved of on other grounds by Eaton v. Johnston*, 235 Kan. 323, 681 P.2d 606 (1984). As recently stated by another panel of this court in upholding the district court's determination that no common-law marriage existed, the present intent to be married "is perhaps the most important of the three requirements because it is the couple's mutual consent that creates the marriage." *Duran v. Christena*, No. 128,485, 2026 WL 546968, at *1 (Kan. App. 2026) (unpublished opinion).

Although the majority affords little weight to the court's opinion in *In re Estate of Keimig*, 215 Kan. 869, 528 P.2d 1228 (1974), regarding common-law remarriage after divorce, I find it instructive. While the elements of common-law marriage remain unchanged when the parties have been previously statutorily married and divorced, "[t]his does not mean the fact of the previous marriage and divorce is to be removed from consideration or placed in a vacuum apart from other facts in the case." 215 Kan. at 872. First, evidence of divorce, which naturally shows some intent not to be married, cannot and should not be ignored. Second, when faced with evidence of divorce, a showing of an intent to remarry is necessary. Where, as here, the parties divorced in 2008 with an award to Gracey of a substantial property settlement, that shows an intent not to be in a marital relationship. There must be some evidence supporting an intent to undo that decision.

There is no question that the intent of the parties is the most difficult element of the three to prove because it is subjective. 1 Elrod, Kansas Law and Practice § 3:8. It should also be recognized that "[w]hen the questions arise upon divorce or death, the person benefitting may indulge in wishful thinking. Common law marriage is often used in ad hoc fashion after the fact of cohabitation." 1 Elrod, Kansas Law and Practice § 3:8, p. 269. While the question of intent to marry is primarily one of fact, and the district court's credibility determinations go unchallenged on review, that does not mean the district court's legal conclusion that sufficient facts existed to support that legal conclusion goes unreviewed.

37

*If a Common-law Marriage Existed, There is Insufficient Evidence that it Began in Kansas*

The timeline demonstrates the problem with finding evidence of the parties' present intent or agreement to remarry, or even be married, in Kansas between 2015 and January 2018. It is undisputed that the parties entered a legal divorce in 2008 in Colorado. Additionally, Gracey does not dispute that she was awarded assets in that divorce including real estate and personal property that the parties valued at more than $1,000,000 at the time of divorce. At trial, Gracey alleged that she never collected on that financial award in the divorce, but that failure does not enhance her argument that a marriage came into existence in Kansas between 2015 and January 2018. Rather, if Gracey forewent collecting on that settlement, that fact provides more support for Gracey's argument in the petition for divorce that the parties never really divorced in 2008. Based on Gracey's argument, the legal divorces in Monaco and Colorado represent a semi-fraudulent formality, and the parties never intended to divorce in 2008 and thus remained married. Essentially, Gracey contends the parties got married in 1998 and stayed married the entire time, but the statutory marriage converted to a common-law marriage in 2008 to the extent that was possible in the appropriate jurisdiction.

First, if the district court accepted Gracey as the more credible witness as to the parties' marital intent, then accepting Gracey's testimony would mean that the parties fraudulently filed for divorce in Colorado and intended to remain married at that time in 2008. Therefore, the status of their common law marriage when Gracey moved to Kansas in 2015 would start with a determination regarding the legality of that marriage under the law of the appropriate jurisdiction where they intended to be married or remarried in 2008—which no one contends is Kansas. See *In re Estate of Hendrickson*, 248 Kan. 72, 75, 805 P.2d 20 (1991). If the district court had found that the parties were common-law married in 2008 and remained married, the evidence might look different. But that was not the district court's legal conclusion. Rather, the district court determined that the

parties divorced in 2008 and sometime after Gracey moved to Kansas in 2015 the common-law marriage "began when they relocated to Cheney, Kansas." I simply do not see substantial competent evidence supporting that conclusion—which is contrary to Gracey's credible testimony.

Of course, if the parties were common-law married after the statutory divorce in 2008 and never got another divorce before Gracey moved to Kansas (as Gracey alleged in the divorce petition), they could have remained common-law married but lived mostly separately. Making that determination would require an analysis of different facts than the district court relied on here and is not what the district court found. Therefore, I cannot speculate about the legal outcome of those potential facts.

*There is insufficient evidence of an intent to be married between 2015 and January 2018.*

Even if we wholly disregard Albawardi's testimony that he did not intend to be and was not married to Gracey after the statutory divorce in 2008, the evidence does not support a finding that Albawardi intended to create a marriage or be married to Gracey between 2015 and January 2018. Even accepting the district court's credibility determination favoring Gracey's testimony over Albawardi's conflicting testimony, the court must still consider the undisputed evidence, even if it tends to favor the party deemed less credible. See *Bicknell v. Kansas Dept. of Revenue*, 315 Kan. 451, 497, 509 P.3d 1211 (2022) (court may favor conflicting testimony of witness deemed more credible). The Kansas home where Gracey lived was purchased in 2010—five years before Gracey contends they relocated to Kansas but shortly after the statutory divorce in Colorado—in the name of an LLC of which Gracey is the sole member. While Gracey was in Kansas between 2015 and 2018, it is undisputed that Albawardi maintained a residence elsewhere, did not own real property in Kansas, and did not live consistently in Kansas. When asked whether Albawardi resided in Kansas "for at least six consecutive months," Gracey testified that Albawardi "hasn't been anywhere in his life for six

consecutive months, because he has always traveled extensively" but she believed he was in Kansas more than he was anywhere else. It is undisputed that Albawardi became a resident of the United Kingdom in 2010 (shortly after the statutory divorce) and also lived in Chicago where he attended school during the relevant times here. Additionally, several witnesses testified that Albawardi lived in Chicago and did not hold himself out as married to Gracey, but, in fact, they knew him to be divorced. Finally, there is also evidence of Albawardi identifying himself as both divorced and single on multiple work, tax, and educational forms.

The majority focuses on the following evidence to affirm the district court's finding that substantial evidence supported the finding that both parties had a present intent to be married in Kansas between 2015 and January 2018:

- Albawardi signed for medication one time as Gracey's husband between 2015 and January 2018.
- Medical professionals believed the two were married because Albawardi did not correct Gracey's statements when Gracey was about to give birth to their children and he listed himself as her spouse on a dental intake form.
- Albawardi did not correct Gracey's father when he introduced Albawardi as his son-in-law.
- Albawardi said he was married when applying to prestigious schools for A.A.
- Petrie, the babysitter, testified that Albawardi introduced himself as Gracey's husband.
- Others in the community testified *they believed* the two were married based on their interactions with Gracey.

Even without considering Albawardi's contradictory testimony explaining these events, I cannot say this evidence supports the legal conclusion that Albawardi had the intent to begin or even continue a common-law marriage in Kansas between 2015 and January 2018.

Importantly, "[t]he general reputation of the parties with respect to being married or single does not prove or disprove the marriage agreement itself" but, instead, it can "be considered in determining whether the parties held themselves out to the public as being husband and wife." *In re Estate of Freeman*, 171 Kan. 211, 213, 231 P.2d 261 (1951). The majority conflates the few instances of Albawardi's holding himself out, or not correcting others who identified him, as Gracey's husband while in Cheney as also establishing his present intent to be married. Albawardi testified he did not correct those in Cheney who believed he was married to Gracey because he did not want to cause issues for his children or "stir up any mess there." However, as the majority correctly notes, common-law marriage cannot be established "if the parties only hold themselves out as married when it is 'advantageous' to them." Slip op. at 24. See *Duran*, 2026 WL 546968, at *3 (noting the finding that a purpose of holding selves out as married through memberships, tax applications, and health insurance was "for the secondary gain and not a demonstration of their relationship," which did not reflect "evidence of a mutual agreement of the parties to be common-law married."). The facts pertaining to when Albawardi held himself out as married largely dealt with an application to prestigious schools and medical-related issues for Gracey, like getting medication from a pharmacy following the birth of the twins.

While, logically, facts supporting a finding that the couple held themselves out as married may also support a finding that they had a present marriage agreement—these facts under the circumstances of their relationship do not accomplish that goal. First, some of these merely relate to the community members' beliefs that the couple were married, unrelated to Albawardi's intent. Second, most demonstrate an effort to obtain a

41

benefit or shortcut an arduous system by claiming marital status. Given the circumstances and history, I cannot say that, after the statutory divorce in 2008, the parties always occupied a stereotypical coparenting or divorcee relationship—but that evidence does not support a mutual intent to create a marriage or be married between 2015 and January 2018.

A broader review of the facts—without considering conflicting evidence reliant on Albawardi's credibility— does not support a finding that *substantial evidence* established *both* parties had a present agreement to be married in Kansas. For example, the following facts that the majority relied on show that Albawardi had an intent to be a parent, not be married:

- Facts related to Albawardi as a parent when he was present in the community and seen at events with Gracey's family.
- The family memberships at the gym and zoo.
- That in vitro fertilization in Dubai requires that "the husband must acknowledge the conjugal relation by producing an official marriage instrument at the time of the fertilization and implantation of the impregnated ovum."

A "family" membership at a local institution does not support a present intent to be married, but an intent to engage in parenting activities at a discounted rate. See *Duran*, 2026 WL 546968, at *3 (holding out for secondary benefit did not demonstrate marriage relationship between parties). It is not uncommon for divorced parents with no intent to be married to each other to have a family membership for children's activities. A cohesive coparenting relationship is not evidence of an intent to be married. It is undeniable that the decision to undergo in vitro fertilizations to have children post-divorce indicates a relationship beyond that of typical divorcees—but of course that occurred in Dubai before Gracey moved to Kansas. The parties used their 1998 Hawaii marriage certificate

for Gracey's in vitro procedure in 2014, and, of course, that certificate was null and void based on a valid divorce decree entered in 2008. Moreover, if the parties intended the 1998 document to evidence their intent to be married, that intent would have been established well before Gracey's move to Kansas. Finally, its use to establish intent is dubious given the country's requirement that the parties demonstrate marriage to receive the benefit of the medical service. Even so, the analysis of common-law marriage would then become whether the parties were already married and stayed married until Gracey relocated to Kansas. Once again, perhaps the legal outcome of that analysis would find that Gracey could still obtain a statutory divorce in Kansas—but that analysis was not done.

In *Schrader*, the husband and wife divorced but then began living together again with their young children. They also held themselves out as married, filed joint tax returns, bought personal property as though married, and registered themselves in hotels as man and wife. However, the wife admitted she was afraid to get remarried when asked why she and her husband had not made a formal recognition of their relationship. Thus, in upholding the district court's determination that no common-law marriage existed, the Kansas Supreme Court agreed there was not evidence supporting a finding that the parties had a present intent to be married, reiterating that "an indispensable constituent of a common-law marriage" in Kansas requires "the existence of a present marriage agreement." 207 Kan. at 351.

It is true that when there are conflicting sides of a story—i.e., one party says they agreed to be married and the other denies such a claim—the district court must essentially choose which side to believe. See *Driscoll v. Driscoll*, 220 Kan. 225, 226, 552 P.2d 629 (1976) (conflicting testimony, found no common-law marriage); *Cain v. Cain*, 160 Kan. 672, 673, 165 P.2d 221 (1946) (same but affirming finding of common-law marriage). However, the burden to demonstrate the parties were married by common law fell solely to Gracey, and the district court found her to be more credible, which it was entitled to

43

do. Accepting the district court's finding that Gracey was more credible, there is not substantial evidence that Albawardi manifested an intent to be married to Gracey between 2015 and January 2018.

As the district court found, Gracey and Albawardi are two highly educated individuals who had a long-term relationship that encompassed various types of relationships with each other. They were business partners, spouses, divorcees, coparents, and, maybe, two people in a non-marriage romantic relationship. They lived in various parts of the world; Albawardi traveled extensively; and, by some accounts, they conducted themselves outside expected or stereotypical norms. They also knew how to formalize their marriage and knew how to legally end that marriage—which they did in 2008. Married or not, romantically involved or not, Albawardi and Gracey created a family unit with their children. Undoubtedly, people can cohabitate, coparent children, and have romantic relationships outside of a legally recognized marriage. In evaluating common-law marriage, this court's role is not to compel parties into the type of relationship it believes they should occupy—but to evaluate the parties' intent regarding that relationship.

I find insufficient evidence to support the district court's finding that both parties had an intent to remarry or be married between 2015 and January 2018. As such, I would reverse and remand.